**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 14-4736**

—————————

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MICHAEL JEROME PALMER,

Defendant – Appellant.

—————————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Robert G. Doumar, Senior District Judge. (2:14-cr-00031-RGD-DEM-1)

—————————

Argued: December 10, 2015          Decided: April 21, 2016

—————————

Before WILKINSON, KING, and WYNN, Circuit Judges.

—————————

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkinson and Judge Wynn joined. Judge Wynn wrote a separate concurring opinion.

—————————

**ARGUED**: James Orlando Broccoletti, ZOBY, BROCCOLETTI & NORMILE, PC, Norfolk, Virginia, for Appellant. Christopher John Catizone, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF**: Dana J. Boente, United States Attorney, Alexandria, Virginia, Darryl J. Mitchell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

—————————

KING, Circuit Judge:

Michael Jerome Palmer appeals the district court's denial of his motion to suppress drug and firearm evidence seized by police officers during a traffic stop in Chesapeake, Virginia. The court conducted an evidentiary hearing and, in early May 2014, rendered its ruling in favor of the government. As explained below, we are satisfied that the officers did not contravene the Fourth Amendment and thus affirm.

I.

A.

In April 2014, the federal grand jury in Norfolk, Virginia, indicted Palmer on two offenses: possession with intent to distribute crack cocaine, in contravention of 21 U.S.C. § 841(a)(1); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Palmer moved to suppress the drug and firearm evidence underlying the charges, which Chesapeake officers had seized during the October 2013 traffic stop of a vehicle driven by Palmer. In May 2014, the district court denied Palmer's suppression motion. See United States v. Palmer, No. 2:14-cr-00031 (E.D. Va. May 5, 2014), ECF No. 35 (the "Opinion"). In June 2014, Palmer pleaded guilty to both offenses in the indictment, but reserved the right to appeal the suppression ruling. In September 2014, the court sentenced him

2

to sixty-one months in prison.  Palmer timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

B.

1.

Because the district court denied Palmer's motion to suppress, we recount the facts in the light most favorable to the government.  See United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).  On October 15, 2013, Officer Ring of the Chesapeake police was patrolling that city's Ipswich neighborhood.  During his patrol, Ring stopped Palmer, who was driving a silver Nissan Altima, on Paramont Avenue.  When Ring exited his patrol car and greeted Palmer through the driver-side window of the Nissan, he smelled an overwhelming odor of air freshener.  He saw at least five air fresheners inside the car, some hanging in the passenger compartment and others plugged into the air-conditioning vents.  Ring advised Palmer that he had been stopped because the Nissan's windows were too darkly tinted, in violation of state law, and also because the inspection sticker on the vehicle's front windshield appeared fraudulent.  Ring then obtained Palmer's driver's license and the vehicle's registration card, and returned to his patrol car to make a database check.

From the driver's license and registration Officer Ring learned that Palmer listed a P.O. box as his address and that

the Nissan was registered to a woman who was not present. Within minutes of beginning the database check, Ring also learned that Palmer was a suspected member of a gang called the Bounty Hunter Bloods, according to a "caution" notice issued by the nearby Norfolk Police Department. See Opinion 2. Ring advised his colleague, Officer Blount — who was also on the scene — of Palmer's purported gang affiliation, and asked Blount about the availability of a drug dog.

Officer Ring also sought information on Palmer from another database called LInX. Ring could not initially log into the LInX system because his former partner had changed the password. He eventually accessed LInX, however — about seven minutes into the traffic stop — by utilizing Officer Blount's login credentials. As Ring was logging into LInX and searching its database, he called about a drug dog. Ring relayed by radio the information that he had gathered: Palmer was nervous; there was an overwhelming odor of air freshener from the Nissan; there were at least five air fresheners in the car; Palmer's driver's license address was a P.O. box, as opposed to a street address; the Nissan was registered to someone other than the driver; and Palmer was a suspected member of the Bounty Hunter Bloods.

About eleven minutes into the traffic stop, Officer Ring identified Palmer in LInX. Ring learned that Palmer had a criminal record that included four arrests on drug charges plus

4

an arrest for illegal possession of a firearm by a convicted felon. As a result, Ring radioed again about a drug dog, but was unable to confirm its availability. After completing his LInX search, Ring returned to the Nissan from his patrol car. Because he suspected the inspection sticker was fraudulent, Ring decided to verify the sticker's authenticity by looking at the back of it, which would enable him to determine whether it was legitimate. After asking Palmer to exit the Nissan, Ring leaned through the open driver-side door and examined the back of the inspection sticker. While reading the sticker — which he concluded was legitimate — Ring smelled marijuana.

Officer Ring immediately advised Palmer that he had grounds to search the Nissan. Because Ring wanted to be "110% sure" that the Nissan contained drugs before searching the vehicle, however, he again checked on the drug dog's availability. See Opinion 3. At that point — approximately seventeen minutes after the traffic stop had been initiated — Ring called Officer Duncan, who had a drug dog. About ten minutes later, Duncan arrived with the drug dog Boomer. Duncan walked Boomer around the Nissan, and the dog alerted twice.

Officers Ring and Duncan thereafter entered and searched the Nissan. They discovered a clear plastic bag containing crack cocaine in the center front console and a 40-caliber Smith & Wesson pistol wedged between the driver's seat and the

5

console.  As a result, Palmer was arrested.  After the search and arrest, Ring measured the Nissan's window tint.  Those measurements confirmed Ring's initial suspicion that the Nissan's windows were illegally tinted.[1]

2.

On April 29, 2014, the district court conducted an evidentiary hearing on Palmer's suppression motion.  During the hearing, Officer Ring — the prosecution's only witness — recounted his actions and observations during the traffic stop.

Officer Ring explained that, before the traffic stop, he knew of numerous citizen complaints to the authorities about the sale and use of illegal drugs in the Ipswich area.  He also described his familiarity with Virginia's legal limits on window tinting and said that he "could barely see into the vehicle" that Palmer was driving.  See J.A. 71-74.[2]  Aside from the window tint, Ring suspected that the Nissan's inspection sticker was illegal, based on his experience and having stopped numerous vehicles with fraudulent stickers.  Ring explained that he could

---

[1] Officer Ring found that the side-front and side-rear windows of the Nissan violated Virginia law by allowing light transmittance of only 40% and 25%, respectively.  Virginia requires side-front windows to permit light transmittance of at least 50%, and side-rear windows to permit light transmittance of at least 35%.  See Va. Code Ann. § 46.2-1052(C).

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

6

not see the perforated portion that should be observable on a legitimate sticker. The back of a legitimate inspection sticker, he said, shows the perforated portion and contains information identifying the vehicle.

Although it is understandable for any person to be nervous when interacting with the police, Officer Ring said that Palmer "appeared to be more nervous than normal" during the traffic stop. See J.A. 79. Specifically, Ring observed that Palmer was "being overly cooperative but still very nervous in his demeanor." Id. Regarding Palmer's liberal use of air fresheners, Ring explained that drug traffickers often use "heavy air freshening" to mask the "pungent odor" of marijuana. See id. at 80. Ring also explained that drug traffickers often operate vehicles registered to others. That is so because, when the police apprehend a drug trafficker, they tend not to seize the vehicle if it is registered to someone not present. Similarly, when Ring was asked — in light of the thousand-plus drug investigations in which he had participated — whether a P.O. box on a driver's license can be indicative of involvement in drug trafficking, he responded affirmatively.

Officer Ring also emphasized that he developed a concern for officer safety after learning of Palmer's suspected gang affiliation and prior criminal record. Ring stated that "[c]riminal street gangs are known for violence" and that his

7

department had received "intelligence reports of threats against law enforcement specifically from the Blood gang." See J.A. 86. Ring explained that Palmer's history of multiple drug arrests, as well as his arrest for possessing a firearm as a convicted felon, caused Ring to believe Palmer "would potentially still have a firearm on him." Id.

According to Officer Ring, Palmer was initially hesitant to get out of the Nissan, and Palmer had thereafter lingered near the vehicle's front door until Ring requested that he move to the car's rear. Shortly thereafter, while Ring was inside the passenger compartment checking the inspection sticker, he "smell[ed] the marijuana very faintly" before his "sense of smell [was] overwhelmed with the air freshener." See J.A. 90. Ring confirmed that Officer Blount smelled marijuana as well.

Officer Ring made at least two other observations that strengthened his suspicion of criminal activity. First, Palmer "had two cell phones on his hip." See J.A. 93. According to Ring, "[i]t's common for people who distribute narcotics to have more than one cell phone in their possession." Id. He said that those involved in drug trafficking often rely on one phone to store contacts and pictures while utilizing the other phone to arrange drug deals. Second, Ring believed that Palmer was seeking to divert suspicion from himself as they waited for Officer Duncan and the drug dog. Palmer "kept telling us that

8

he helps the police and that he ha[d] a contact [in] the police department." See id. at 95.

As the hearing ended, the district court remarked that Officer Ring had "presented to this Court a very, very careful appearance, one of a person who is very seriously trying to abide by what the requirements of the law are." See J.A. 210. Although it was inclined to believe that Ring had acted lawfully, the court took the suppression motion under advisement.

C.

On May 5, 2014, within a week of the evidentiary hearing, the district court filed its Opinion denying the suppression motion.[3] The Opinion concluded that Officer Ring had properly stopped the Nissan, based on suspicions of a window tint violation and a fraudulent inspection sticker. The Opinion explained that Ring also possessed the reasonable, articulable suspicion of criminal activity necessary to extend the traffic stop, identifying eight supporting factors in that regard:

---

[3] Officer Ring made a video recording of the traffic stop from a camera he was wearing on his uniform. After viewing the video during the evidentiary hearing as Ring testified, the district court observed that Ring presented "a very truthful appearance." See J.A. 206. The court later reviewed the video "at a slow pace in chambers, stopping to analyze the footage from time to time to be doubly sure of its interpretation." See Opinion 1.

9

- Palmer was in a high crime area where citizens were complaining about drug dealing;

- Ring believed that the Nissan's windows were illegally tinted;

- Palmer was nervous;

- The Nissan emitted an "overwhelming" scent of air freshener from the multiple air fresheners;

- Palmer was a suspected member of a violent gang called the Bounty Hunter Bloods;[4]

- Palmer's driver's license listed a P.O. box address, rather than a residence;

- Palmer was driving a vehicle registered in another person's name; and

- Palmer had "a criminal record that included four previous arrests for narcotics charges as well as a charge of possession of a firearm by a convicted felon."

See Opinion 9. The Opinion explained that those factors, "when taken together, [gave] rise to reasonable suspicion because they eliminate[d] a substantial portion of innocent travelers and indicate[d] that criminal activity [was] afoot." Id. That is, Ring possessed the "reasonable suspicion necessary to extend the stop beyond its original scope and duration as soon as he completed the computer checks." Id.

---

[4] The district court observed that it was "very familiar with the Bloods and their propensity for violence," based on "its prior cases involving members of th[at] gang." See Opinion 9 n.3.

10

The Opinion also explained that Officer Ring had probable cause to search the vehicle when he first smelled marijuana and also after the drug dog alerted. Without specifying whether Ring's entry to check the inspection sticker constituted a search of the Nissan, the Opinion concluded that Ring had "reasonable suspicion . . . to investigate the inspection sticker's authenticity," and that he had dispelled that suspicion by "the least intrusive means in a short period of time." See Opinion 12-13. Ring's detection of a marijuana odor while in the car, in turn, supplied ample cause for a search of the Nissan. According to the Opinion, the officers were also entitled to delay searching the vehicle and wait for a drug dog.[5]

In sum, the Opinion ruled that Officer Ring had made a legitimate traffic stop, that he had sound reasons for extending the stop, and that his subsequent actions did not violate the Fourth Amendment. Palmer's motion to suppress the evidence was therefore denied. The constitutionality of Ring's search-and-seizure activities is the sole question preserved by Palmer's conditional guilty plea.

---

[5] The Opinion reasoned in the alternative that, even if Officer Ring's entry into the vehicle to examine the inspection sticker was somehow improper, the drug and firearm evidence could not be suppressed. That was so because "Ring's actions demonstrate conclusively that he would have brought the [drug dog] to the [traffic] stop to perform the [dog sniff] test irrespective of his entrance into the vehicle." See Opinion 17.

11

II.

We review de novo a district court's rulings with respect to reasonable suspicion and probable cause. See Ornelas v. United States, 517 U.S. 690, 699 (1996). Absent clear error, we will not disturb factual findings made by a district court after an evidentiary hearing on suppression issues. See United States v. Dire, 680 F.3d 446, 473 (4th Cir. 2012). When a district court has denied a suppression motion, we view the evidence in the light most favorable to the government. See United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).

III.

On appeal, Palmer contends that Officer Ring did not have any objectively reasonable basis for initiating the traffic stop of the Nissan, and that Ring unreasonably expanded the scope of the stop shortly after it began. Palmer also labels Ring's entry into the Nissan to view the inspection sticker as constitutionally impermissible. The government counters that Ring legitimately stopped Palmer for suspected traffic violations, and that Ring's subsequent actions were consistent with the Fourth Amendment.

A.

Before assessing the parties' contentions, we identify some pertinent legal principles. The Fourth Amendment guards against

12

"unreasonable searches and seizures." See U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment and must be reasonable under the circumstances. See Delaware v. Prouse, 440 U.S. 648, 653-54 (1979). In that regard, the courts assess the constitutionality of a traffic stop under the two-prong standard articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Arizona v. Johnson, 555 U.S. 323, 330-31 (2009). Pursuant thereto, we first assess whether the articulated bases for the traffic stop were legitimate. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Second, we examine whether the actions of the authorities during the traffic stop were "reasonably related in scope" to the bases for the seizure. Id. (internal quotation marks omitted).

1.

As the Supreme Court has explained, Terry's first prong is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." See Johnson, 555 U.S. at 327. Without question, such a violation may include failure to comply with traffic laws. See, e.g., United States v. Green, 740 F.3d 275, 279 n.1 (4th Cir. 2014) (concluding that windows "illegally tinted" under Virginia law "justif[ied] the stop"); United States v. Digiovanni, 650 F.3d 498, 506-07 (4th Cir. 2011) (observing that officer made traffic stop on basis of perceived violation of

13

Maryland law that prohibits following another vehicle too closely).

In assessing the legitimacy of a traffic stop, we do not attempt to discern an officer's subjective intent for stopping the vehicle. See United States v. Branch, 537 F.3d 328, 340 (4th Cir. 2008). We simply ask whether "the circumstances, viewed objectively, justify th[e] action." See Whren v. United States, 517 U.S. 806, 813 (1996) (internal quotation marks omitted); United States v. Johnson, 734 F.3d 270, 275 (4th Cir. 2013) (observing that a traffic stop is legitimate "when officers observe a traffic violation, regardless of their true, subjective motives for stopping the vehicle").

2.

Terry's second prong restricts the range of permissible actions that a police officer may take after initiating a traffic stop. An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants. See Rodriguez v. United States, 135 S. Ct. 1609, 1615-16 (2015). Generally, however, an officer's focus must remain on the bases for the traffic stop, in that the stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." See United States v.

14

Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (internal quotation marks omitted).

Thus, when following up on the initial reasons for a traffic stop, the officer must employ "the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." See Digiovanni, 650 F.3d at 507 (internal quotation marks omitted). To be clear, the law does not require that the officer employ the least intrusive means conceivable. See United States v. Sharpe, 470 U.S. 675, 686-87 (1985) ("A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."). If an officer acts unreasonably in attempting to confirm his suspicions during a traffic stop, however, he runs afoul of Terry's second prong.

Relatedly, a legitimate traffic stop may "become unlawful if it is prolonged beyond the time reasonably required" to complete its initial objectives. See Illinois v. Caballes, 543 U.S. 405, 407 (2005). Put differently, an officer cannot investigate "a matter outside the scope of the initial stop" unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity. See Digiovanni, 650 F.3d at 507.

Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." See Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). As we recently explained in United States v. Williams, the articulated factors supporting reasonable suspicion during a traffic stop "must in their totality serve to eliminate a substantial portion of innocent travelers," and also demonstrate a connection to criminal activity. See 808 F.3d 238, 246 (4th Cir. 2015) (internal quotation marks omitted).

Finally, although an officer may extend a traffic stop when he possesses reasonable suspicion, he cannot search the stopped vehicle unless he obtains consent, secures a warrant, or develops probable cause to believe the vehicle contains evidence of criminal activity. See United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013). An officer's detection of marijuana odor is sufficient to establish such probable cause, see United States v. Carter, 300 F.3d 415, 422 (4th Cir. 2002), as is a trained drug dog's alert on the vehicle, see United States v. Kelly, 592 F.3d 586, 592 (4th Cir. 2010). With the foregoing principles in mind, we turn to the issues presented in Palmer's appeal.

B.

1.

With respect to <u>Terry</u>'s first prong — whether Officer Ring's articulated bases for the traffic stop were legitimate — Palmer asserts that Ring lacked any objectively reasonable grounds for stopping the Nissan. That contention is meritless. Ring was familiar with the limits on window tint under Virginia law and, in his view, the Nissan's windows were too dark. Palmer points to nothing that indicates the district court clearly erred in crediting Ring's testimony on that issue. <u>See</u> <u>United States v. McGee</u>, 736 F.3d 263, 271 (4th Cir. 2013) (concluding that district court's reliance on officer's testimony regarding inoperative brake light was not clearly erroneous). As we have recognized, illegally tinted windows are alone "sufficient to justify" a traffic stop. <u>See</u> <u>Green</u>, 740 F.3d at 279 n.1. We thus reject Palmer's contention that Ring lacked any objectively reasonable basis for stopping the Nissan.

2.

Turning to the events that transpired after the Nissan had been stopped, Palmer acknowledges that when an officer has probable cause to believe a vehicle contains contraband, the Fourth Amendment "permits police to search the vehicle without more." <u>See</u> Br. of Appellant 31 (internal quotation marks omitted). While checking the Nissan's inspection sticker,

17

Officer Ring smelled marijuana. At that point, he had probable cause to believe the vehicle contained contraband, and was therefore entitled to search it. See Carter, 300 F.3d at 422. Thus, unless Palmer can demonstrate some constitutional violation between the time the stop began and the point that Ring smelled marijuana, the evidence cannot be suppressed.[6] In that regard, Palmer asserts that Ring transgressed Terry's second prong by taking actions during the traffic stop that were not reasonably related in scope to the initial bases for the stop.

a.

According to Palmer, Officer Ring unreasonably expanded the scope of the stop by beginning an unjustified drug investigation. The government contends, however, that Ring's actions were supported by reasonable suspicion.

A motorist stopped by the police is obliged to endure "certain negligibly burdensome precautions" that may not relate directly to the reason for the traffic stop, such as checking whether the driver has a criminal record or outstanding warrants. See Rodriguez, 135 S. Ct. at 1616; see also Muehler

_____

[6] Rather than search immediately after smelling marijuana, Officer Ring waited about ten minutes for the drug dog Boomer to arrive. The dog's alerts provided strong additional support for the proposition that the Nissan contained contraband. See Kelly, 592 F.3d at 592.

18

v. Mena, 544 U.S. 93, 101 (2005) (concluding that questioning unrelated to basis for traffic stop was not unlawful because it did not extend detention). Those routine checks reflect the reality that traffic stops are "especially fraught with danger to police officers," and further the strong interest in allowing an officer to complete his traffic mission safely. See Michigan v. Long, 463 U.S. 1032, 1047 (1983). Indeed, in Terry itself, the Supreme Court — describing "[t]he crux of th[e] case" — emphasized the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." See 392 U.S. at 23.

Palmer suggests that it was unreasonable for Officer Ring — after learning of the "gang alert" indicating that Palmer was associated with the Bounty Hunter Bloods — "to delve into [his] prior criminal record," because it had "absolutely nothing to do with investigating a window tint or inspection sticker violation." See Br. of Appellant 18. To describe that contention is to discard it. A police officer is entitled to inquire into a motorist's criminal record after initiating a traffic stop, and we cannot fault Ring — faced with a suspected member of a violent gang — for doing so here. See Green, 740 F.3d at 281 (observing that "concern for officer safety" justified "criminal history check"). In short, Ring's brief

19

investigation into Palmer's criminal record fell squarely within the range of actions permitted under Terry's second prong.

Nor did Officer Ring's detention of Palmer prior to smelling marijuana unreasonably expand the scope or duration of the traffic stop. We are satisfied that, after accessing Palmer's criminal record in LInX, Ring possessed a reasonable, articulable suspicion that Palmer was engaged in criminal activity. In other words, the information on which Ring relied eliminated a substantial portion of innocent travelers and logically demonstrated a connection to unlawful conduct. The Opinion identified eight factors in that regard: Palmer was in a high crime area where citizens were complaining about drug dealing; Ring believed that the Nissan's windows were illegally tinted; Palmer was nervous; the Nissan emitted an "overwhelming" scent of air freshener from multiple air fresheners; Palmer was a suspected member of the Bounty Hunter Bloods; Palmer's driver's license listed a P.O. box address, rather than a residence; Palmer was driving a vehicle registered in another person's name; and Palmer had "a criminal record that included four previous arrests for narcotics charges as well as a charge of possession of a firearm by a convicted felon." See Opinion 9.

Palmer insists that most of those factors "relate[] to perfectly innocent behavior and are not indicative of criminal

20

activity." See Br. of Appellant 19. He fails to appreciate, however, that reasonable suspicion is based on the totality of the circumstances, and may well "exist even if each fact standing alone is susceptible to an innocent explanation." See United States v. McCoy, 513 F.3d 405, 413-14 (4th Cir. 2008) (footnote omitted).

Resolving the reasonable-suspicion question turns on whether the articulated factors, taken together, showed a connection to ongoing criminal activity. Palmer maintains that the various factors evince Officer Ring's "attempt to take a series of perfectly mundane, innocent, and easily explained behaviors and circumstances and weave them into a web of deception." See Br. of Appellant 24 (internal quotation marks omitted). The government counters that Ring described how those factors were connected to suspected criminal conduct.

As we have recognized with respect to a reasonable-suspicion inquiry, "it is entirely appropriate for courts to credit the practical experience of officers who observe on a daily basis what transpires on the street." See Branch, 537 F.3d at 336-37 (internal quotation marks omitted). We do not, however, credit that experience blindly. See Williams, 808 F.3d at 253. Instead, we expect police officers to articulate how that experience applies to the facts at hand. See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011) ("[A]n officer and

21

the Government must do more than simply label a behavior as 'suspicious' to make it so.").

Officer Ring knew that the Ipswich neighborhood was a high-crime area and that the police had received complaints about illegal drug activity there. See Branch, 537 F.3d at 338 (observing that "an area's propensity toward criminal activity is something that an officer may consider" in forming reasonable suspicion (internal quotation marks omitted)). It is compelling that, when Ring approached the darkly tinted Nissan, he smelled an overwhelming odor from the air fresheners that he could see in the vehicle, suggesting an effort to conceal the scent of drugs. See United States v. Foreman, 369 F.3d 776, 785 (4th Cir. 2004) (concluding that air fresheners on rearview mirror supported reasonable suspicion because they are "commonly used to mask the smell of narcotics").

Significantly, Officer Ring learned, early in the traffic stop, that Palmer was a suspected member of the Bounty Hunter Bloods. Ring knew that the Bloods had threatened law enforcement during his service as a police officer and that such gangs are frequently involved in organized criminal activity such as "narcotics distribution." See J.A. 86. Ring also ascertained that Palmer had at least four earlier arrests on drug charges and was probably a convicted felon. Indeed, he had been charged previously as a felon in possession of a firearm.

22

As we explained in United States v. Sprinkle, "an officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity." See 106 F.3d 613, 617 (4th Cir. 1997). At minimum, such "concrete factors" in this situation included the overwhelming odor from multiple air fresheners and Palmer's apparent gang membership.

Put succinctly, the factors identified by the Opinion — viewed in their totality — eliminated a substantial portion of innocent travelers and demonstrated a connection to possible criminal activity.[7] We are thus satisfied that Ring's actions prior to examining the Nissan's inspection sticker were entirely permissible under Terry's second prong, because Ring did not unreasonably expand the scope of the traffic stop.

---

[7] Some of the factors identified by the district court, when viewed in isolation, provide somewhat weaker support for reasonable suspicion. First, a driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police. See Williams, 808 F.3d at 248. Second, the listing of a P.O. box as an address on a driver's license, as opposed to a residential address, is not a strong indicator of suspicious conduct. See id. at 250-51. Finally, simply driving a vehicle registered to an absent third party is also not a strong factor, but could, in the proper situation, indicate the possibility of a "stolen vehicle or drug trafficking." See United States v. Ludwig, 641 F.3d 1243, 1249 (10th Cir. 2011) (internal quotation marks omitted).

23

b.

Palmer also maintains that Officer Ring conducted a warrantless search of the Nissan without probable cause when he stuck his head inside the car to examine its inspection sticker. According to Palmer, Ring's actions constituted "the most intrusive means of confirming or dispelling the validity of the sticker." See Br. of Appellant 33. The government counters that Ring did not conduct a search within the meaning of the Fourth Amendment, and argues that Ring was simply seeking "a better look" at "an item that a motorist is legally required to display on [his] vehicle for ready inspection by law enforcement." See Br. of Appellee 38.

i.

Palmer frames his contention regarding Officer Ring's examination of the inspection sticker in terms of "reasonableness." Under the applicable principles, to contest Ring's entry into the Nissan on the ground that it was an illegal search, Palmer must show that he had "a legitimate expectation of privacy in the area searched." See United v. Castellanos, 716 F.3d 828, 832 (4th Cir. 2013) (relying on Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980)). Palmer has not asserted, much less shown, any legitimate expectation of privacy that was unreasonably infringed. He therefore cannot rely merely on Ring's examination of the inspection sticker as a

24

basis for suppressing the cocaine and firearm evidence.  See id. at 834-35 (recognizing that defendant who fails to show reasonable expectation of privacy cannot challenge warrantless search of vehicle).

ii.

Although Palmer has failed to establish any expectation of privacy, he also asserts that the district court clearly erred in its findings regarding the inspection sticker's appearance and, consequently, that Officer Ring lacked a reasonable suspicion that the sticker was fraudulent.  Palmer also contends that Ring failed to utilize the least intrusive means reasonably available to investigate the sticker.  We evaluate those contentions under Terry's second prong.  See Guijon-Ortiz, 660 F.3d at 764.

When reviewing factual findings for clear error, "[w]e particularly defer to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress."  See United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008) (internal quotation marks omitted). The Opinion credited Officer Ring's testimony regarding the appearance of the inspection sticker during the traffic stop, explicitly relying on Ring's observations that he "had seen numerous fraudulent stickers" and that the Nissan's inspection

25

sticker "looked like those fraudulent stickers he had seen in the past." See Opinion 11. The district court also found that Ring could not see, from outside the Nissan, "the perforated portion that sits in the middle of the sticker and is designed to prevent sticker theft by detaching." Id. Moreover, the court itself "examined the sticker both in the video [of the traffic stop] and in a photograph" that Palmer introduced into evidence. See id. at 12.

Based on Officer Ring's testimony and the district court's examination of the evidence, the Opinion found that the inspection sticker was lighter in color than normal and that "the perforated middle portion [was] not visible from the car's outside." See Opinion 12. Palmer characterizes the evidence differently, but points to nothing that contradicts the court's findings. In such circumstances, we cannot say that the court clearly erred. See McGee, 736 F.3d at 271. Because Ring had a legitimate basis for believing that the inspection sticker was fraudulent, we agree that the facts recited by the court, "coupled with Officer Ring's training and experience with inspection stickers," support the "reasonable suspicion Ring required to investigate the sticker's authenticity." See Opinion 12.

26

Finally, Palmer argues that, even if Officer Ring possessed a reasonable suspicion that the inspection sticker was fraudulent, his means of investigation were improper. Palmer posits two alternatives in that regard: Ring could have "run the number on the sticker through the State Police database"; or he could have "asked for the inspection certificate." See Br. of Appellant 33. In assessing those alternatives, we must decide whether the district court correctly concluded that Ring employed "the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." See Digiovanni, 650 F.3d at 507 (internal quotation marks omitted).

The burden of demonstrating the appropriateness of Officer Ring's conduct is on the government. See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). We are mindful, of course, that the "scope of the intrusion permitted will vary," depending on the specific facts and circumstances. Id. Again, we are bound by the findings of the district court unless they are clearly erroneous. See Abu Ali, 528 F.3d at 232. In rejecting Palmer's theories for less intrusive alternatives, the Opinion explained that it was not clear that Officer Ring — a city police officer — had access to a state police database of vehicle registration information. The Opinion also observed

27

that there was no indication that the inspection certificate was in the Nissan during the traffic stop.

We cannot doubt Officer Ring's statement that he was not familiar with any state database such as Palmer describes. Nor are we persuaded that the presence or absence of the inspection certificate has any significance. Ring was entitled to ask Palmer to step out of the vehicle, see Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (per curiam), and it does not give us pause — in light of Palmer's affiliation with a violent gang, his prior criminal charges, and his apparent felony conviction — that Ring would request that Palmer exit the Nissan rather than have him reach for something out of sight in the passenger compartment. Finally, neither of Palmer's proposals would have been more expeditious, because Ring — in examining the back of the inspection sticker — was promptly in and out of the Nissan. The government has therefore satisfied its burden, readily showing that Ring's means of investigating the inspection sticker were appropriate and not unreasonably intrusive.

In these circumstances, we are convinced that no constitutional violation occurred. See Sharpe, 470 U.S. at 687 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."). As a result, the district court correctly denied Palmer's suppression motion.

28

IV.

Pursuant to the foregoing, the judgment of the district court is affirmed.

AFFIRMED

WYNN, Circuit Judge, concurring:

I fully concur in the majority opinion. I write separately to emphasize that while the Supreme Court omitted criminal background checks from its list of "ordinary inquiries" authorized incident to every traffic stop, Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015), this Court in United States v. Green, 740 F.3d 275 (4th Cir. 2014), held that a traffic stop was reasonably prolonged in order to conduct a background check because the driver's "demeanor and behavior throughout the traffic stop in conjunction with [an outstanding] protective order [against the driver] raised concerns about officer safety." Id. at 281.

In this case, the specific circumstances of the stop indicate the officer had at least some legitimate concern for his own safety. Thus, I agree with the majority opinion that "we cannot fault Ring – faced with a suspected member of a violent gang – for [inquiring into the motorist's criminal record] here." Ante, at 19.