UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Chafin, Malveaux and Senior Judge Frank
Argued at Norfolk, Virginia


WILLIAM THOMAS JOHNSON, II

MEMORANDUM OPINION[*] BY
v.      Record No. 1215-15-1      JUDGE ROBERT P. FRANK
                                  NOVEMBER 15, 2016

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
John W. Brown, Judge

Kathleen A. Ortiz, Public Defender, for appellant.

Lauren C. Campbell, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


William Thomas Johnson, II (hereinafter "appellant") was convicted of possession of

marijuana and possession of a Schedule II controlled substance.  On appeal, he asserts the trial

court erred in denying his motion to suppress.  For the reasons stated herein, we reverse the trial

court's denial of the suppression motion and remand the case for further proceedings if the

Commonwealth be so advised.

BACKGROUND

"[W]hen a defendant challenges the denial of a motion to suppress, he has the burden to

show that the trial court's ruling constituted reversible error."  Adams v. Commonwealth, 48

Va. App. 737, 745, 635 S.E.2d 20, 24 (2006).

> In reviewing the denial of a motion to suppress evidence claiming
> a violation of a person's Fourth Amendment rights, we consider
> the facts in the light most favorable to the Commonwealth, the
> prevailing party at trial.  The burden is on the defendant to show

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

that the trial court committed reversible error. We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence. We will review the trial court's application of the law *de novo*.

Malbrough v. Commonwealth, 275 Va. 163, 168-69, 655 S.E.2d 1, 3 (2008).

On November 20, 2013, Chesapeake Police Officer Keith Ewell was patrolling an area known for high drug activity. At approximately 10:00 p.m., he stopped a red SUV with a defective headlight. The officer and the vehicle pulled into a convenience store parking lot. The officer requested identification from the driver and the three passengers.[1] The driver indicated they were proceeding to purchase a vehicle on Portsmouth Boulevard, but the officer noted their present location was not a normal route to take to Portsmouth Boulevard. Based on his training and experience, their location in a high drug area, the time of night, and their explanation of where they were going, the officer did not believe the driver. Based on the time, the driver's account and the vehicle's location, Ewell suspected the vehicle was involved in illegal narcotics.[2]

Upon retrieving the vehicle registration and identifying information from the two male passengers, Ewell returned to his vehicle and, prior to running the information through DMV ("Division of Motor Vehicles"), VCIN ("Virginia Criminal Information Network"), NCIC ("National Crime Information Center"), and LInX ("Law Enforcement Information Exchange"), he immediately called for a K9 officer at 3:46. Ewell checked the information he collected from the driver and the two male passengers. Upon determining that the driver was licensed, Ewell was no

---

[1] The young female passenger in the SUV did not provide Ewell with identification when he collected IDs from the driver and the two males passengers, and Ewell did not ask her for her name or address at that time.

[2] The officer wore a video camera which recorded the incident and the time that elapsed during the stop. At the suppression hearing the Commonwealth had Ewell testify while referring to the video and using corresponding minute and second markers as noted on the video. Those time markers will be referred to by the minute and second -- e.g., 3:46 means 3 minutes 46 seconds.

longer interested in his driving status. Ewell found no criminal history regarding the passengers or the driver that caused him concern.

Officer Samuel arrived at the scene with his dog at 10:09,[3] some six minutes after the initial call. Upon Samuel's arrival, Ewell closed his laptop computer and left his vehicle at 10:09. Between 10:48 and 11:52, he assisted a female motorist who was lost and gave her directions to her destination.

At 11:52, Ewell began assisting Samuel. Prior to the K9 walk around, all passengers were directed to exit the vehicle pursuant to the standard procedure for a drug dog sweep. Neither officer patted down the driver and passengers for weapons.

At 15:46, Samuel removed his dog from his vehicle and approached the SUV. The dog circled the vehicle three times without a positive alert but Samuel noticed a change in the dog's behavior near the front of the passenger area where appellant had been sitting. Samuel did not believe the dog's behavior created probable cause to search the vehicle. The dog was then returned to the K9 unit at 17:34.

After determining appellant was the front seat passenger, Samuel called appellant away from the others. At 18:01, Samuel began to question appellant about drugs. When Samuel asked appellant if there were any illegal drugs in the SUV, appellant replied, "Not to my knowledge." At this point during the questioning, Ewell walked away from the other three occupants and approached Samuel and appellant. Samuel then asked appellant if appellant had any illegal drugs on his person. At 19:14, appellant replied in the negative. However, when Samuel asked if he could search appellant, appellant responded at 19:24 into the stop, that he "had a little bit" and

---

[3] Ewell testified regarding the timeline of events during the stop at the suppression hearing. To the extent any conflict exists between his testimony and the time stamps on the video footage as Defendant's Exhibit 1, we rely upon the video time stamps. Some times are derived from correlating events in the Ewell and Samuel footage.

reached in his pocket. Appellant handed a baggie of marijuana to Ewell at 19:29. Appellant was arrested at 21:08. A search of his person produced an unlabeled pill bottle containing unidentified pills. Ewell placed appellant in the back of his cruiser.

The officers searched the SUV and found pills in an unlabeled bottle in the female passenger's purse. Ewell entered his cruiser and called poison control regarding the pills recovered from appellant and the female passenger's purse. Based on the information provided by poison control, Ewell concluded that the pills in appellant's possession were a Schedule II narcotic and arrested appellant a second time. However, he was unable to ascertain preliminarily the nature of the female passenger's pills.

Ewell approached the SUV again and advised the driver and the remaining two occupants that appellant was under arrest for possession of a Schedule II narcotic. Ewell returned all of the information he had previously collected from the driver and male passenger without performing any further computer checks on their information. Ewell made no mention of the headlight violation. Instead, he instructed the driver and the passengers to wait so that he could investigate the female's pills further. Only after questioning the female passenger about her pills and obtaining her name and address did Ewell perform any further computer checks. When the computer check apparently produced nothing incriminating with regard to the female, Ewell returned to the SUV and told her he was keeping her pills and would have them tested. However, he did not mention the equipment violation.

Ewell returned to his cruiser and yelled to Samuel that the SUV was free to go. As reflected in Ewell's camcorder footage, Ewell opened his computer for the third time as the SUV drove away in the background.[4]

---

[4] Seven entries appeared on the DVD that was admitted into evidence as Defendant's Exhibit 1. Six of those entries contained footage related to the stop. Three of the six entries contained footage from Ewell's body camera, and three contained footage from Samuel's body

Appellant moved to suppress the drugs recovered from him and his statements to the police during the stop. The court denied the motion to suppress and found:

> [O]nce an officer has validly stopped the vehicle for purposes of determining whether to issue a summons, he's allowed to obtain registration information and to request the identities of all the occupants of the vehicle. And he's allowed to reasonably confirm information about all of the vehicle's occupants to see whether there's - - the driver's validly licensed, whether the vehicle is all right, and whether there's any warrants or anything that would cause him to have concern about the occupants.
>
> And then, again, there is no Fourth Amendment prohibition for having a drug dog walk around a vehicle if that's part of an otherwise legitimate law enforcement stop. So it really gets down to under the circumstances here - - and there is no magic time that I'm aware of that any appellate court has said a traffic stop has to begin and end, and so I focus - - and I watched it a few times just to make sure, because I thought that's what the defense might be looking at, and that is the time when Office Ewell gets back to the car and first calls for Officer Samuel to come out there. And then before, you know, we see Officer Samuel there and Officer Ewell speaking to him, he's in the car, pressing keys on what looks to be a small computer that's in there.

Appellant was convicted of the two drug charges. This appeal followed.

ANALYSIS

On appeal, appellant contends the trial court erred in denying his motion to suppress evidence seized after the drug dog's arrival, including the drugs and appellant's statements to the police. Appellant asserts the delay caused by Ewell's summoning the drug dog and his

---

camera. The final entry on the DVD was footage taken from Ewell's body camera. The footage, 22 minutes and 23 seconds long, begins with images of Ewell pulling over the SUV. This footage contains the initial discussions between Ewell and the driver, Ewell collecting the SUV occupants' IDs, returning to his cruiser and calling Samuel, and running computer checks. This segment also captures appellant's arrest for possession of marijuana. The footage concludes with Ewell advising the SUV occupants that appellant "did have something" on him and announcing he would be checking the SUV to see if appellant "put anything else" in the vehicle.

subsequent abandonment of the traffic investigation while the dog was deployed amounted to more than a *de minimis*[5] delay, thereby violating appellant's Fourth Amendment rights.[6]

> A defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal. In making such a determination, we give deference to the factual findings of the circuit court, but we independently determine whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment. The defendant has the burden to show that, considering the evidence in the light most favorable to the Commonwealth, the trial court's denial of his suppression motion was reversible error.

McCain v. Commonwealth, 275 Va. 546, 551-52, 659 S.E.2d 512, 515 (2008) (citations omitted).

The Supreme Court of the United States made clear in Rodriguez v. United States, 135 S. Ct. 1609 (2015), that a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." Id. at 1614. The Court went on to hold that a dog sniff that prolonged the traffic stop was impermissible because a dog sniff is "not fairly characterized as part of the officer's traffic mission" because it is not related to an inquiry into the traffic infraction at issue or officer safety. Id. at 1615-16. In Rodriguez, the Supreme Court

---

[5] "*De minimis*" is a Latin maxim meaning "the law does not concern itself with trifles." Bryan A. Garner, Garner's Dictionary of Legal Usage 263 (3d ed. 2009). Black's Law Dictionary defines it as "trifling; negligible so insignificant that a court may overlook it in deciding and issue . . . ." *De Minimis*; Black's Law Dictionary (10th ed. 2014).

[6] Appellant does not challenge the legality of the stop nor any delay caused by the officer's initial use of the computer.

specifically rejected the "*de minimis*" line of cases. See Matthews v. Commonwealth, 65

Va. App. 334, 344-45, 778 S.E.2d 122, 127-28 (2015) (recognizing that, based upon Rodriguez,

"a police officer 'may conduct certain unrelated checks during an otherwise lawful traffic stop,'

but 'may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily

demanded to justify detaining an individual'" (quoting Rodriguez, 135 S. Ct. at 1614)).

Accordingly, under Rodriguez the detention associated with the officers' drug investigation in

this case violated the Fourth Amendment unless that detention was supported independently by a

reasonable, articulable suspicion of criminal wrongdoing. The Commonwealth does not argue

that the detention associated with the drug investigation was justified by reasonable suspicion.

Therefore, if we were to decide this case guided solely by Rodriguez, the officers' drug

investigation leading to appellant's confession violated appellant's Fourth Amendment rights.

Likewise, the search of appellant following his marijuana arrest was tainted by the illegal

investigation and arrest.

However, whether appellant's Fourth Amendment rights were violated is not the end of

our analysis. We must also consider whether the exclusionary rule applies to the officers'

actions.

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that

exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the

price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009). In Davis

v. United States, 564 U.S. 229 (2011), the Supreme Court extended this principle to instances

where the law changed after the time of the search, holding that evidence obtained during a

search conducted in reasonable reliance on binding precedent at the time is not subject to the

exclusionary rule. Id. at 240-41 (cited in Matthews, 65 Va. App. at 347, 778 S.E.2d at 129).

At the time of this incident, existing law established that a *de minimis* delay in the completion of a traffic stop to conduct an investigation unrelated to the traffic stop did not violate the Fourth Amendment. Matthews, 65 Va. App. at 348, 778 S.E.2d at 129. As this Court recognized in Atkins v. Commonwealth, 57 Va. App. 2, 698 S.E.2d 249 (2010), a "*de minimis*" delay to pursue matters unrelated to the original basis for the stop was lawful under Arizona v. Johnson, 555 U.S. 323 (2009). Atkins recognized that, under Johnson the

> temporary seizure of the driver and passengers ordinarily continues, and remains reasonable for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification of the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

Atkins, 57 Va. App. at 15, 698 S.E.2d at 256 (quoting Johnson, 555 U.S. at 333).

While appellant acknowledges that the police were entitled to impose a *de minimis* delay to conduct an investigation unrelated to the initial purpose of the stop, he asserts the trial court erred by ruling that the delay in this case was *de minimis*. Citing Commonwealth v. Ramsdell, No. 2925-06-3, 2007 Va. App. LEXIS 166 (Va. Ct. App. Apr. 20, 2007),[7] appellant maintains that his detention was unlawful because Ewell did not complete his inquiry into the status of the driver's license and the criminal background check of the passengers. Instead, Ewell abandoned his record check, left his vehicle, and assisted Samuel in his drug investigation.

In Ramsdell, two narcotics officers observed Ramsdell and another person sitting in a parked car, followed by a third person entering the back seat briefly before exiting again. Based

---

[7] We recognize that unpublished opinions have no binding effect on our decision, but may be considered in our analysis of a similar legal issue. See Otey v. Commonwealth, 61 Va. App. 346, 351 n.3, 735 S.E.2d 255, 258 n.3 (2012) ("Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value.").

upon these observations, the officers suspected Ramsdell was engaged in drug activity. When Ramsdell drove away, the officers stopped him for a defective brake light.

After stopping Ramsdell, the officers took no action toward citing him for the equipment violation. They did not perform a computer check and did not inform Ramsdell of the reason for the stop. Instead, they immediately directed Ramsdell to exit his vehicle and asked for consent to search the car. We affirmed the trial court's decision granting the appellant's motion to suppress, concluding that "the officers abandoned the initial purpose of the stop, the traffic infraction, and without reasonable, articulable suspicion, continued to unlawfully detain Ramsdell in an attempt to secure consent for an otherwise invalid search." Id. at *9.

As the Court observed in Matthews, however, Ramsdell may be distinguished from a stop in which the officer "spen[ds] the *majority* of the time during the stop reviewing the documents . . . provided, calling into dispatch, gathering paperwork, reviewing the code section for the . . . violation, and preparing the written warning." Matthews, 65 Va. App. at 353, 778 S.E.2d at 131-32 (emphasis added).

Thus, in determining whether the delay associated with the drug dog and drug investigation was *de minimis,* we must analyze and decide what part of the detention was devoted to the equipment violation citation process and what part of the detention was devoted to the drug investigation. To do so, we must begin by deciding when the citation process began and when it ended.

The trial court did not make a factual finding regarding when the citation process ended, and because no traffic citation was ever issued, the record contains no definite conclusion to the citation process. Thus, based upon the circumstances surrounding the stop, we must decide when the citation process should have reasonably ended.

Rodriguez decided that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614. As we have recognized, however, the United States Supreme Court decided prior to Rodriguez that a "seizure remain[ed] lawful only 'so long as [unrelated] inquiries d[id] not measurably extend the duration of the stop.'" Matthews, 65 Va. App. at 344, 778 S.E.2d at 127 (quoting Johnson, 555 U.S. at 333). "A 'seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time *reasonably* required to complete that mission.'" Id. (emphasis added) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Caballes, 543 U.S. at 407.

"[C]ourts assess the constitutionality of a traffic stop under the two-prong standard articulated in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Palmer, 820 F.3d 640, 648 (4th Cir. 2016). Under the first prong, "we . . . assess whether the articulated bases for the traffic stop were legitimate." Id. Under the second prong, "we examine whether the actions of the authorities during the traffic stop were 'reasonably related in scope' to the bases for the seizure." Id. at 649 (quoting United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992)). Terry's second prong is pertinent to our analysis here. As recently recognized by the United States Court of Appeals for the Fourth Circuit,

> Terry's second prong restricts the range of permissible actions that a police officer may take after initiating a traffic stop. An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants. See Rodriguez v. United States, 135 S. Ct. 1609, 1615-16 (2015). Generally, however, an officer's focus must remain on the bases for the traffic stop, in that the stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." See United States v.

- 10 -

Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (internal quotation marks omitted).

Palmer, 820 F.3d at 649.  "[W]hen following up on the initial reasons for a traffic stop, the officer must employ 'the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time.'"  Id. (quoting United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011)).  "[A] legitimate traffic stop may 'become unlawful if it is prolonged beyond the time reasonably required' to complete its initial objectives."  Id. (quoting Caballes, 543 U.S. at 407).

> A motorist stopped by the police is obliged to endure "certain negligibly burdensome precautions" that may not relate directly to the reason for the traffic stop, such as checking whether the driver has a criminal record or outstanding warrants.  See Rodriguez, 135 S. Ct. at 1616.  Those routine checks reflect the reality that traffic stops are "especially fraught with danger to police officers," and further the strong interest in allowing an officer to complete his traffic mission safely.  See Michigan v. Long, 463 U.S. 1032, 1047 (1983).  Indeed, in Terry itself, the Supreme Court — describing "[t]he crux of th[e] case" — emphasized the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."  See [Terry], 392 U.S. at 23.

Id. at 651 (citation omitted).

As the Maryland Court of Special Appeals noted in Charity v. State, 753 A.2d 556, 572 (Md. Ct. Spec. App. 2000), "the purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course."  Id. at 565 (cited in Ramsdell, 2007 Va. App. LEXIS 166, at *7).  "Even where the traffic stop is not formally terminated by the issuance of a citation or warning, 'the legitimating raison d'etre evaporates if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation.'"  Ramsdell, 2007 Va. App. LEXIS 166, at *9 (quoting Charity, 753 A.2d at 565).

Ewell testified at the suppression hearing that he immediately called for a drug dog before turning to the information provided by the driver and the two male passengers. After confirming the driver was licensed, Ewell testified that he had no further interest in his "driving status." Ewell then checked the information on the two male passengers. He determined that neither the male passengers nor the driver had a criminal history that "caused [him] to be more suspicious."[8] With respect to the female passenger, Ewell had so little concern that he did not ask her to provide any biographical information. Ewell and Samuel removed appellant, the driver, and the other two passengers from the SUV without frisking them for weapons. Instead, the video depicts Ewell chatting with the four occupants while Samuel performed the sweep and occasionally asking them to keep their hands out of their pockets.

Accordingly, by the time Samuel arrived and performed the K9 sweep, whatever safety concerns Ewell initially had that prompted him to run computer checks on the SUV occupants, were no longer an issue. In fact, as borne out by Ewell's video footage, he never performed any further computer checks of the male occupants' information after Samuel's arrival. Instead, after Samuel's arrival, the officers' focus centered solely on the drug investigation. They swept the SUV with a drug dog and questioned appellant about whether he had any drugs. After eliciting a confession from appellant, they arrested him for marijuana possession, and recovered pills from him during a search. Ewell searched the SUV, not only in the front seat where appellant was located, but also in the back seat area on the passenger side. When additional unidentified pills were found in the female's purse, Ewell detained the SUV occupants so that he could further investigate the pills, not so that he could complete the computer checks of the males' identification that he testified was underway at the time Samuel arrived.

---

[8] Ewell also testified, however, that the computer had "not completed the checks that [he] w[as] requesting" at the time Samuel arrived at the scene.

Because Ewell performed no further computer checks on the driver or the two males after Samuel's arrival, we must conclude that he had all the information reasonably necessary to complete the equipment violation citation process by the time Samuel arrived.[9] Ewell himself admitted he typically decided whether to issue a citation or release a driver with only a warning after he "checked information." When asked "what changed" about this stop that prompted him "to keep people there," Ewell explained that he was "putting the pieces of the puzzle together," and felt it "odd that they [the SUV passengers] were where they're at, that time of night, saying they're [there] to do what they're doing." At no time after the original traffic stop did Ewell mention the defective headlight to the driver or the SUV occupants or pursue writing a summons.

Based on the foregoing evidence, we conclude that, at the time Samuel arrived, Ewell had all the information reasonably necessary to conclude the citation process for the equipment violation. At that point in time, approximately ten minutes into the stop, the justification for the traffic stop no longer existed.[10]

---

[9] As the Supreme Court reiterated in Rodriguez, "[t]he reasonableness of a seizure . . . depends on what the police in fact do." Rodriguez, 135 S. Ct. at 1616 (citing Knowles v. Iowa, 525 U.S. 113, 115-17 (1998)).

[10] We recognize that the trial court, after viewing the video, found Ewell was still reviewing the computer when Samuel arrived and further found that the officer did not deliberately delay the investigation. An appellate court "should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Reittinger v. Commonwealth, 260 Va. 232, 236, 532 S.E.2d 25, 27 (2000) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). However, while the trial court concluded it could find no evidence on which to reject Ewell's testimony that "he was still in the process of running the information" at the time Samuel arrived, it made no factual finding as to when Ewell completed checking the driver's and the two male passengers' identification. Likewise, the trial court made no finding regarding the point in the stop at which Ewell had all the information reasonably necessary to complete the traffic citation process.

Ewell's only testimony on this point was general. While Ewell testified that he was "still in the process of checking everybody's IDs and stuff when Officer Samuel came up," he never specified the time when he had concluded his investigation of the traffic stop except to state vaguely that "once the drug investigation or whatever you want to call it started and I completed the checking of the IDs of the person, I decided to let him go on a warning."

Having concluded that the citation process should have reasonably concluded at the time of Samuel's arrival, we must now assess whether the time period between Samuel's arrival and appellant's arrest and search constitutes a *de minimis* delay.

As previously noted, Samuel arrived approximately ten minutes after the traffic stop. By the time Samuel and Ewell had developed enough information to elicit a confession from appellant at 19:24, culminating in his arrest at 21:08, slightly over another nine to eleven minutes had elapsed. Thus, the time devoted to the drug investigation after the traffic stop should have reasonably concluded nearly doubled the duration of the stop. We therefore conclude that the time devoted to the drug investigation was not *de minimis* and violated appellant's rights under the Fourth Amendment. Unlike our decision in Matthews, we cannot conclude that, based upon the evidence before us, the officers devoted "the majority of the time during the stop reviewing the documents . . . provided, calling into dispatch, gathering paperwork, reviewing the code section for the . . . violation, and preparing the written warning . . . ." Matthews, 65 Va. App. at 353, 778 S.E.2d at 131-32.

Nothing in the cases cited by the Commonwealth, Ellis v. Commonwealth, 52 Va. App. 220, 662 S.E.2d 640 (2008), and United States v. Mason, 628 F.3d 123 (4th Cir. 2010), compels us to reach a different conclusion. In Ellis the entire stop lasted approximately five minutes, and "the only period of delay attributable to the drug issue was the one-minute conversation the officer had with Ellis . . . ." Ellis, 52 Va. App. at 225, 662 S.E.2d at 642. We noted that "[a]ll other time segments . . . solely related to the detention justifiably required for the traffic stop and issuance of the citation." Id. (footnote omitted). In Mason the time between the initial stop and the issuance of the warning ticket was eleven minutes. Of that time, approximately three and one-half minutes were devoted to questioning Mason and his passenger, and "only one to one and one-half minutes involved questioning on matters unrelated to the traffic stop." Mason, 628

- 14 -

F.3d at 131. Thus, while the United States Court of Appeals for the Fourth Circuit recognized that "a traffic stop may not be extended beyond the time *reasonably* necessary to effectuate the stop," it concluded that "[t]he one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern." Id. at 132.[11]

Here, over nineteen minutes elapsed from the time Ewell stopped the SUV and appellant admitted he had illegal drugs. Only ten minutes of that detention was reasonably devoted to the traffic citation process. Thus, in contrast to Ellis and Mason, nearly half of the approximate nineteen-minute detention of Johnson and the other SUV occupants was devoted to the drug investigation rather than the citation process.

Accordingly, we conclude that the additional delay from the time Samuel arrived until the time appellant confessed and was arrested was not *de minimis* for Fourth Amendment purposes, that the continued seizure of appellant during that time period violated the Fourth Amendment, and that any evidence collected by the police after Samuel's arrival, including the drugs and appellant's statements, were subject to the exclusionary rule. Herring, 555 U.S. at 144.

---

[11] The Commonwealth's position that any delay associated with the drug investigation was *de minimis* is based upon the faulty premise that the traffic stop was still in progress at the time that the drug dog swept the vehicle. The Commonwealth wrongly assumes that Ewell had not completed, or reasonably could not have completed the background checks and traffic citation process by the time the K9 unit arrived.

We acknowledge that Mason secondarily held that an "11-minute traffic stop" was not so long as to constitute "an unconstitutional delay." Id. However, because the traffic stop in Mason, as well as in Ellis, clearly terminated upon the issuance of a citation, the court was not called upon to decide when the traffic stop portion of the detention should have reasonably concluded. While we decide here that, based upon the facts and circumstances presented, the traffic stop should have reasonably concluded after approximately ten minutes, we do not hold that a ten-minute traffic stop is *per se* unconstitutional.

We reverse the judgment of the trial court on the suppression motion, reverse appellant's convictions, and remand the case for further proceedings if the Commonwealth be so advised.

<u>Reversed and remanded.</u>