**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4516**

---

UNITED STATES OF AMERICA,

　　　　　Plaintiff − Appellee,

　　v.

JAMES EDWARD MCDONALD,

　　　　　Defendant – Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:21−cr−00115−LCB−1)

---

Argued:  October 31, 2023　　　　　　　　　　Decided:  April 9, 2024

---

Before DIAZ, Chief Judge, KING and WYNN, Circuit Judges.

---

Affirmed by unpublished opinion.  Chief Judge Diaz wrote the opinion in which Judge King joined.  Judge Wynn wrote a dissenting opinion.

---

**ARGUED:**  Ira Richard Knight, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant.  Lindsey Ann Freeman, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Louis C. Allen, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greensboro, North Carolina, for Appellant.  Sandra J. Hairston, United States Attorney, Eric L. Iverson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Chief Circuit Judge:

James Edward McDonald conditionally pleaded guilty to possession with intent to distribute cocaine and possession of a firearm by a felon after unsuccessfully moving to suppress evidence seized by law enforcement. That evidence was found on McDonald and in a vehicle he occupied. McDonald was sentenced to 72 months in prison and a three-year term of supervised release.

On appeal, McDonald argues that Officer Thomas Greathouse—who seized (and later searched) McDonald—lacked a reasonable, articulable suspicion for doing so, violating the Fourth Amendment. We disagree and affirm the district court's judgment.

I.

A.

Because the district court denied McDonald's suppression motion, we recount the facts in the light most favorable to the government, the prevailing party below. *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (cleaned up).

Law enforcement—including Officer Greathouse—arrived at a public housing unit parking lot to arrest Joseph Cates.[1] The housing unit was in "one of the higher crime areas in the city of Durham." J.A. 060. And Cates—a known gang member with an outstanding warrant for aggravated assault—had been broadcasting live Instagram video of himself and another person brandishing firearms. This other person had a dreadlock hairstyle.

---

[1] The government entered Greathouse's body worn camera footage into evidence.

3

When the officers arrived in an unmarked SUV, Cates was standing next to a Honda and "interacting" with its driver—McDonald. J.A. 060–061. There was a woman in the Honda's passenger seat, and three other individuals standing in the parking lot nearby.

When the officers exited their vehicle, Cates pulled a pistol from his pants and fled. Although Greathouse didn't know it then, a second person also fled. Two officers chased Cates, leaving Greathouse alone in the parking lot. Greathouse had drawn his own firearm before exiting the vehicle, which was parked about six feet in front of the Honda. Almost "immediately," Greathouse heard the Honda's engine rev and observed "a lot of movement" from the car, as if McDonald and the passenger were reaching under their seats to "either retriev[e] a firearm or . . . discard[] illegal items." J.A. 064–065.

Greathouse then pointed his weapon at the Honda and ordered its occupants to show their hands and McDonald to shut off the vehicle. McDonald complied, at least at first. "Within seconds," Greathouse smelled marijuana, which he thought—based on his training and experience—was coming from a concentrated source. J.A. 065. And because he didn't see smoke anywhere else, he suspected that the odor came from the Honda.

Because he was in a vulnerable position, Greathouse took cover behind a sedan about a car's length from the Honda. As he retreated, he noticed that McDonald had dreadlocks—as did the other armed individual in Cates's Instagram video—and he saw McDonald roll up the Honda's driver-side window. About fifteen seconds had elapsed between the time Greathouse exited the police vehicle and when he took cover behind the sedan.

4

After holding his position for about twenty seconds, Greathouse walked back to the police vehicle and called for backup. He then saw McDonald and the passenger lower their hands out of view. Greathouse ordered them to keep their hands where he could see them and directed McDonald to roll down the window. McDonald did so, sticking his head, then his hands, out of the vehicle. About a minute and forty-five seconds had now elapsed since Greathouse's arrival.

Greathouse also confronted three other people in the parking lot, who stood between the Honda and the sedan. He issued various commands to them—to lay down, to show their hands, to stay away from the Honda, and to leave the area—to which they were only "partially compliant." *United States v. McDonald*, 1:21-CR-115-1, 2022 WL 475227, at *3 (M.D.N.C. Feb. 16, 2022). Greathouse, however, never saw the individuals reach for any weapons, nor did he see any bulges in their clothing that would suggest such weapons.

Soon after McDonald rolled down his window (and two minutes after Greathouse's arrival), Greathouse approached the Honda and again smelled marijuana. Because the smell was "stronger towards . . . the front of [the Honda]," J.A. 085, Greathouse determined that it was coming from inside the vehicle.

Standing at the driver-side window, Greathouse heard on his radio that Cates had been taken into custody and that the second suspect had fled into the woods. Greathouse then asked McDonald whether he had a gun and observed McDonald "nervous[ly]" looking down. J.A. 068. Based on his experience, Greathouse believed that McDonald was looking at a hidden firearm.

5

Greathouse opened the driver-side door and briefly frisked McDonald for weapons. He next ordered McDonald to exit the vehicle, where he handcuffed and again frisked McDonald.

Once backup arrived nine or so minutes later, Greathouse searched the Honda, finding a pistol, two digital scales, vacuum seal baggies, and 30.8 grams of marijuana. Greathouse also searched McDonald and found a pill bottle containing 6.4 grams of cocaine.

B.

McDonald moved to suppress the seized evidence, which the district court denied. The district court first noted that "[t]he events critical to [McDonald]'s motion all occurred within a few seconds." *McDonald*, 2022 WL 475227, at *2. It agreed that Greathouse needed reasonable suspicion to seize McDonald, rejecting the government's argument otherwise. *Id.* at *3.

The government had contended that, because McDonald was Cates's "known companion" and was in "the vicinity" when Cates was arrested, Greathouse could have detained McDonald absent reasonable suspicion. *Id.* (cleaned up); *see United States v. Poms*, 484 F.2d 919 (4th Cir. 1973). But the district court held that McDonald's "interaction with Cates may factor into the reasonable suspicion analysis under the *Terry* totality of the circumstances test but is insufficient on its own to justify a search or seizure." *Id.* (cleaned up).

The district court next held that McDonald wasn't "seized" for Fourth Amendment purposes until Greathouse pointed his firearm at McDonald and McDonald complied with

6

his order to turn off the Honda. *Id.* at *4 ("Absent physical force, a seizure requires assertion of authority and *submission* to the assertion of authority." (cleaned up)). Turning then to the operative question—whether Greathouse had reasonable suspicion to justify the seizure—the district court recounted the "several pieces of relevant information [Greathouse had] at the time of this seizure." *Id.* Specifically, Greathouse (1) knew that there were at least two armed individuals in the vicinity,[2] (2) knew that McDonald had been interacting with one of those individuals, (3) heard McDonald rev the Honda's engine in a potential attempt to flee, (4) smelled the odor of marijuana in or around the Honda, and (5) saw McDonald lower his hands and reach down while in the front seat. *Id.*

The district court found "that the totality of these circumstances gave Officer Greathouse a reasonable suspicion of criminal activity and a reasonable fear for his safety[,]" thus justifying the seizure. *Id.* The district court also found that Greathouse's frisk of McDonald was supported by reasonable suspicion, and his later search of the Honda and McDonald were supported by probable cause because Greathouse (1) suspected McDonald was armed, and (2) had by then particularized the marijuana smell to the Honda. *Id.* at *5.

After the district court denied his motion, McDonald pleaded guilty to the drug and gun charges but reserved the right to appeal the district court's decision. This appeal followed.

---

[2] McDonald doesn't challenge the district court's finding that Greathouse knew "at least two individuals in the vicinity were armed with pistols," and that the second individual with dreadlocks "was unaccounted for." *McDonald*, 2022 WL 475227, at *4.

II.

McDonald argues that the district court erred in denying his motion to suppress because Greathouse lacked reasonable suspicion McDonald was engaged in criminal activity when he detained McDonald. Contending that Greathouse "suffered from tunnel vision," McDonald urges that the seized contraband was the "result of an unlawful search" and was therefore the "fruit of the poisonous tree." Appellant's Br. at 17 (cleaned up).

We take a different view and affirm McDonald's conviction.

A.

In assessing the district court's denial of a suppression motion, we review its factual findings for clear error and its legal conclusions de novo. *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020) (cleaned up). We "particularly defer to [the] district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016) (cleaned up).

McDonald's motion implicates the Fourth Amendment, a guardrail "against 'unreasonable searches and seizures.'" *Id.* at 648 (quoting U.S. Const. amend. IV). The "touchstone" of this Fourth Amendment inquiry is "reasonableness," which calls for a balance "between the public interest in basic community safety and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013) (cleaned up).

That balance informs the narrow issue here: whether Greathouse—who arrived at the scene to arrest another individual—had reasonable suspicion to detain McDonald. For

8

even a brief, non-consensual detention passes constitutional muster only if it's supported by reasonable suspicion. *See United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012).

McDonald contends that, because Greathouse lacked the requisite reasonable suspicion for the initial seizure, the later search violated the Fourth Amendment.[3] We turn to that argument.

## B.

### 1.

As did the district court, we evaluate reasonableness based on the totality of the circumstances. *Mitchell*, 963 F.3d at 390. We scrutinize the information available to Greathouse at the time of the seizure *collectively* rather than *individually* to determine whether that "whole picture" amounts to reasonable suspicion of criminal activity. *See id.* (cleaned up). At bottom, reasonable suspicion requires "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (cleaned up).

We're mindful that reasonable suspicion "may well exist even if each fact standing alone is susceptible to an innocent explanation." *Palmer*, 820 F.3d at 652 (cleaned up). Yet while "[r]easonable suspicion is a less demanding standard than probable cause," it

---

[3] McDonald suggests that the seizure and search required only reasonable suspicion. *See* Appellant's Br. at 11 ("Officer Greathouse did not have a reasonable, articulable suspicion to justify his detention *and subsequent search* of the vehicle.") (emphasis added). Greathouse's search of the Honda, however, required probable cause. *Palmer*, 820 F.3d at 650. Still, we agree with the district court that Greathouse had probable cause.

still "requires at least a minimal level of objective justification for" the seizure. *Mitchell*, 963 F.3d at 390 (cleaned up).

We first consider what Greathouse knew before he arrived at the housing complex. He knew, for example, that the complex was in a high crime area. He knew too that Cates was not only wanted for aggravated assault, but also that he was brandishing a firearm in the Instagram video. Finally, Greathouse knew that a second individual with dreadlocks was with Cates and possibly armed.

We next consider what Greathouse learned when he arrived on scene. Within seconds, Greathouse saw McDonald interacting with Cates, heard McDonald rev the Honda's engine after Cates fled, and smelled marijuana around the Honda (and McDonald). Soon after, he saw McDonald lower his hands, reach down in the front seat, and roll up the Honda's driver's-side window—disobeying Greathouse's commands. McDonald continued to raise and lower his hands, as if reaching for or hiding something, and only lowered the window again when ordered to. Greathouse then particularized the marijuana smell to the Honda.[4]

We agree with the district court that these circumstances—and the inferences Greathouse drew from them—amounted to reasonable suspicion. *See United States v.*

---

[4] The dissent characterizes these events—which occurred after McDonald's seizure—as "irrelevant," but we can't agree. Dissent at 24. Greathouse needed reasonable suspicion to frisk McDonald and probable cause to later search the Honda. *Palmer*, 820 F.3d at 650. And though there's a singular moment of "seizure" for Fourth Amendment purposes, Greathouse needed reasonable suspicion to continue detaining McDonald beyond that initial seizure. *See United States v. Branch*, 537 F.3d 328, 339 (4th Cir. 2008). The facts recited here are relevant—and indeed vital—to each of those analyses.

10

*Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (evaluating reasonable suspicion based on "the circumstances known to the officer and the specific reasonable inferences which he is entitled to draw from the facts in light of his experience" (cleaned up)).

2.

McDonald resists this conclusion, challenging, for example, that his "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Appellant's Br. at 18 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Putting aside that we're assessing reasonable suspicion and not probable cause, the district court acknowledged that at least some of these circumstances alone, without more, wouldn't justify McDonald's seizure.

As the district court explained, McDonald's interaction with Cates was "insufficient *on its own* to justify a search or seizure." *McDonald*, 2022 WL 475227, at *3 (emphasis added); *see also Sibron v. New York*, 392 U.S. 40, 62 (1968) (explaining no probable cause for search and seizure underlying heroin conviction where officer "merely saw [defendant] talking to a number of known narcotics addicts"). Nor was it enough that Greathouse encountered McDonald in a high crime area, *Bumpers*, 705 F.3d at 172–73 (cleaned up), or that he suspected McDonald was armed,[5] *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013); *see also Mitchell*, 963 F.3d at 396 (Wynn, J., dissenting).

---

[5] There's no evidence Greathouse knew McDonald was a felon, and thus couldn't legally carry a firearm. But we can't say that Greathouse seized McDonald only because he suspected McDonald might be armed, legally or not. The record supports, and Greathouse testified, that other facts—the location, McDonald's interaction with Cates and

11

But context matters. Greathouse seized McDonald in a high crime area where McDonald was interacting with a known, armed suspect (and with the knowledge that a second armed individual with dreadlocks was unaccounted for). McDonald also revved the car engine as if to flee, and then lowered his hands as if to reach down under the front seat. And Greathouse immediately smelled marijuana, which he later particularized to the Honda. Thus, the seizure wasn't based solely on McDonald's proximity to Cates, but his proximity to Cates *and* his own conduct.

We consider too that while this wasn't a typical *Terry* stop to enforce traffic laws, the inherent dangers of traffic stops were still present. *See Michigan v. Long*, 463 U.S. 1032, 1047 (1983) (noting that traffic stops are "especially fraught with danger to police officers"). McDonald was in a running vehicle, which he revved when the officers arrived. So Greathouse had a reasonable fear for his safety. *See* J.A. 081 (Greathouse explaining he instructed McDonald to turn off the Honda so he couldn't "run me over").

In short, the "whole picture" of the incident easily clears the reasonable suspicion hurdle.

### C.

### 1.

McDonald also challenges the district court's finding that Greathouse was credible. McDonald argues that Greathouse misled his supervisor about McDonald's similar

---

movement in the Honda, the engine rev, and the marijuana odor—all suggested that criminal activity was afoot.

12

appearance to the dreadlocked and armed individual in the video, mischaracterized the three bystanders' conduct, undermined his own safety concerns by pacing between the sedan and police car, and didn't testify consistently about the marijuana odor. Appellant's Br. at 15–17. But we give great deference to the district court's superior position to weigh credibility, *see Palmer*, 820 F.3d at 653, and can't agree that McDonald's arguments identify a clear error.

The crux of McDonald's argument is that Greathouse "suffer[ed] from tunnel vision," Appellant's Br. at 17, and impermissibly targeted McDonald rather than others present at the scene. To be sure, Greathouse testified that officers experience "tunnel vision," but do so to triage among "multiple threats" and to "support" their fellow officers in confronting those threats. J.A. 063–064. And Greathouse explained the multiple threats present at the housing unit: at least two armed individuals, one of whom had a warrant for aggravated assault, and McDonald's revving the engine in a running vehicle. Moreover, Greathouse had good reason to focus on McDonald when the other officers pursued Cates, and the three bystanders (compliant or not) weren't in a car, didn't appear to be armed, and weren't behaving in a threatening manner.

## 2.

McDonald's cursory challenge to Greathouse's decision to frisk him while he was inside the Honda is even less persuasive. *See* Appellant's Br. at 16.

To begin, Greathouse didn't seize any contraband during that first frisk. And by that point, Greathouse had particularized the smell of marijuana to the Honda. Then, when Greathouse asked McDonald if he had a firearm, McDonald appeared nervous and looked

13

down.   Based on Greathouse's experience, he suspected McDonald was looking for a concealed weapon.  As the district court correctly found, this evidence constitutes at least reasonable suspicion, if not probable cause.  *See United States v. Jones*, 952 F.3d 153, 158 (4th Cir. 2020) ("[W]e have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place." (cleaned up)); *United States v. Weatherspoon*, 821 F. App'x 231, 233 (4th Cir. 2020) (finding reasonable suspicion to frisk defendant for weapons where officer "reasonably suspect[ed] that the [defendant] may be armed and presently dangerous" (cleaned up)).

## D.

Our colleague in dissent voices sweeping concerns about how law enforcement might use—and abuse—this opinion to justify otherwise plainly unconstitutional conduct. But in doing so, the dissent makes several critical errors, both in its interpretation of the facts and in the standard of review governing this appeal.

To begin, we revisit our standard of review: we recount the facts in the light most favorable to the government.  We need go no further to discern the dissent's first error. Rather than accept this standard, the dissent instead wrangles the facts in McDonald's favor.

McDonald and an armed and wanted Cates, for example, were "merely two people hanging out" when police arrived.  Dissent at 32.  Indeed, McDonald was simply "chatting with friends," *id.* at 38, and at "3 PM on a Friday" no less, *id.* at 37, an apparently crime free time of day (despite that Cates had multiple outstanding warrants, hadn't turned

14

himself in, and was brandishing a firearm).[6]  And when McDonald revved the engine and reached under his seat before he was seized, he was only "floundering in his car and hit[] the gas pedal," *id.* at 38, an "understandable reaction," *id.* at 40, given Greathouse's arrival on the scene.  But none of these facts are grounded in the record, much less are they viewed in the government's favor.

The dissent doesn't stop there.  Not only should we view these facts in McDonald's favor, we also should find each circumstance "unparticularized" and wholly "innocuous," *id.* at 23, forming "*no basis*" at all for reasonable suspicion, *id.* at 31 (emphasis added).  In scoffing at the totality-of-the-circumstances approach, the dissent doesn't simply argue that the circumstances don't, in sum, support reasonable suspicion.  Rather, in the dissent's view, each of the circumstances registers no measure of suspicion at all.

According to our colleague, McDonald's interaction with Cates, his physical similarities with the second armed individual, and his evasive movement inside the Honda are all innocuous.  So too is the smell of marijuana, the engine rev, and that the seizure occurred in a high-crime area.  Even while acknowledging that we can properly consider at least some of these facts in evaluating the totality of the circumstances, *see id.* at 37, the dissent would say that they don't support our analysis here, alone or collectively.

---

[6] The dissent attempts to put a gloss on these facts, reiterating that "Cates had stowed the firearm . . . when the police arrived."  Dissent at 32 n.4.  But the dissent fails to acknowledge that Cates brandished the firearm again and fled almost immediately after the police arrived but before Greathouse seized McDonald.

But the dissent overlooks our directive that even "factors susceptible of innocent explanation, when taken together, may form a particularized and objective basis of reasonable suspicion." *Walker v. Donahoe*, 3 F.4th 676, 683 (4th Cir. 2021) (cleaned up). And by taking this absolutist approach, the dissent fails to unpack how the district court layered these factual circumstances into a "whole picture": for example, that Greathouse interpreted McDonald's engine rev as an attempt to flee which, combined with a general smell of marijuana and with the movement inside the Honda as if to destroy evidence of contraband, led to a reasonable suspicion of criminal activity. *See McDonald*, 2022 WL 475227, at *4 (cleaned up). Simply labeling a circumstance as innocuous doesn't make it so.

The dissent emphasizes that Greathouse wrongly (and "bold[ly]," Dissent at 33) assumed McDonald was the second dreadlocked individual from the Instagram video. *See id.* at 32–33. But the reasonable suspicion standard is, of course, an objective one. *Walker*, 3 F.4th at 682. Put another way, whether Greathouse was ultimately right or wrong about the identity of the dreadlocked and armed individual is of no moment, so long as his suspicion was reasonable. And McDonald doesn't argue that Greathouse's assumption that McDonald resembled the second armed individual was unreasonable, only that there was a bystander "who *better matched the description of the second armed individual.*" Appellant's Br. at 13.

Turning to that point, the dissent insists that Greathouse couldn't know whether the dreadlocked individual was McDonald or the second bystander (or another person) because Greathouse hadn't seen the Instagram video. *See* Dissent at 32–33. But, by the same logic,

16

Greathouse also didn't know that the dreadlocked individual *wasn't* McDonald or that someone else may have better matched the description. And, in any event, the district court credited Greathouse's testimony about why he was less suspicious of the dreadlocked bystander, who wasn't in a car, wasn't "reaching," and didn't appear to be armed. *McDonald*, 2022 WL 475227, at *3. We're in no position to upset that credibility determination.

The dissent also makes arguments on McDonald's behalf, to include some that McDonald didn't even raise to the district court. So, for example, our friend chides us for "accept[ing] without question" the district court's holding on when McDonald was "seized" for Fourth Amendment purposes. Dissent at 27–28 n.1. But McDonald never invited us to question that holding. While the dissent cites *United States v. Cloud*, 994 F.3d 233, 244 (4th Cir. 2021) in making this challenge, the defendant in *Cloud* raised the district court's holding on the moment of seizure on appeal. McDonald, though, made no attempt to explain why the district court's reasoning was error, much less clear error, or even cited any law challenging his seizure.[7]

---

[7] The closest McDonald comes to challenging the district court's finding on his seizure is in saying, without further comment or argument, that he "did not have the freedom to leave, because the Honda Pilot was blocked in by the DPD blue SUV, and Officer Greathouse issued commands to shut of the Honda Pilot while pointing his gun at [McDonald] and his girlfriend." Appellant's Br. at 15. But "[a] party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up).

So too does the dissent take up the mantle in challenging Greathouse's credibility as to what he saw McDonald doing in Honda. Our colleague argues that he's "not convinced" by "Greathouse's characterization of McDonald's actions as being indicative of an attempt to flee or destroy evidence." Dissent at 37. But this argument is entirely of the dissent's creation. McDonald didn't challenge Greathouse's testimony on this point, or the district court's factual findings crediting that testimony.

Confoundingly, the dissent accepts that we may consider evasive movement in assessing reasonable suspicion, yet rejects it as justifying Greathouse's suspicion because "an officer must do more than simply label a behavior as 'suspicious' to make it so." *Id.* (cleaned up). But Greathouse wasn't suspicious of McDonald's movement for suspicion's sake. He suspected that McDonald might be the second individual from the Instagram video and that McDonald's movement in the car suggested that he was either attempting to (1) retrieve a weapon or (2) destroy evidence of contraband (i.e., marijuana). *See McDonald*, 2022 WL 475227, at *4 ("Finally, [Greathouse] saw Defendant and the Honda's second occupant reaching down, which he believed based on his experience may have been an attempt to either retrieve a weapon or destroy evidence of criminal conduct.")

Next, the dissent raises yet another novel argument for McDonald's benefit: that even if McDonald was the second armed individual in the Instagram video, Greathouse had no way of knowing McDonald couldn't legally carry the firearm in North Carolina. *See* Dissent at 32–33. The dissent relies on *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) in making this argument. And to be sure, we held in *Black* that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot

18

justify an investigatory detention." 707 F.3d at 540. But the difference, once again, is that Black (unlike McDonald) raised that argument to the district court and on appeal in challenging the district court's reasonable suspicion holding.

Attempting to justify its advocacy for McDonald, the dissent says we won't "even consider *Black*'s application to the present case merely because McDonald doesn't cite it." Dissent at 34 n.5 (cleaned up). But McDonald doesn't simply fail to cite *Black*. He makes *no argument at all* as to the legality of his firearm possession.

For that reason, the dissent's citation to *Manning v. Caldwell*, 930 F.3d 264, 271– 72 (4th Cir. 2019) (en banc) (citing cases) rings hollow. There, we considered *abandoned* arguments where the "issue . . . was litigated fully and was decided by the district court" and where "neither party [would] be prejudiced by consideration of the . . . issue." *Id.* at 272. The opposite is true here. The issue was *never* litigated, the district court made no legal findings on it, and the government would be prejudiced if we considered it now, especially with the dissent treating it as a nearly dispositive factor.

In any event, *Black* doesn't apply when a person is otherwise lawfully stopped and his potentially legal possession of a firearm poses a threat of danger to law enforcement. *United States v. Robinson*, 846 F.3d 694, 698–701 (4th Cir. 2017). In *Robinson*, we recognized that "the risk inherent in all traffic stops is heightened exponentially when the person who has been stopped—a person whose propensities are unknown—is armed with a weapon that could unexpectedly and fatally be used against the officer in a matter of seconds." *Id.* at 699. In such a case, "[t]he presumptive lawfulness of an individual's gun

19

possession . . . does next to nothing to negate the reasonable concern an officer has for his own safety[.]" *Id.* at 701 (cleaned up).

The dissent says that we can't apply *Robinson*'s holding here because it requires us to "collapse[] the requirements for making a stop with the requirements for conducting a frisk." Dissent at 35 (cleaned up). Not so.

First, this case doesn't involve a legal-possession challenge to a frisk, so there's no separate analyses to collapse. Additionally, the *Robinson* court was responding to the defendant's argument there that "the officer's frisk was not justified by any reasonable suspicion that [the defendant] was *dangerous*," which the court said "confuse[d] the standard for making stops . . . with the standard for conducting a frisk." *Robinson*, 846 F.3d at 698. In other words, we were simply acknowledging that a frisk requires more than a stop (a distinction which, again, isn't at issue here).

But we were also very clear that "traffic stops *alone* are inherently dangerous for police officers" and "that traffic stops of persons who are armed, whether legally or illegally, pose yet a greater safety risk to police officers." *Id.* (emphasis added). This was true "whether the *temporary detention* is a traditional, 'on-the-street' *Terry* stop to investigate *an officer's reasonable suspicion* that the person apprehended is committed or has committed a criminal offense, or a stop of a motor vehicle and all of its occupants to enforce a jurisdiction's traffic laws." *Id.* at 698–99 (cleaned up) (emphasis added). In short, the same safety concerns are implicated whether an officer is confronting a potentially armed individual during a stop or during a frisk.

20

Those safety concerns exist here too where Greathouse knew a dreadlocked individual had a firearm, and where McDonald also had dreadlocks, was seen interacting with an armed Cates, was in a running vehicle that he then revved, and was seen reaching under his seat as if to retrieve a weapon. The dissent, nonetheless, gives these concerns no oxygen, posturing that "*Robinson* has no bearing on our analysis until we have first concluded that the stop was lawful." Dissent at 36. But while that may be a limitation the dissent wishes to articulate, it's not one found in *Robinson*'s holding.

In fact, the *Robinson* court noted "that the Supreme Court repeatedly recognized that whenever police officers use their authority *to effect a stop*, they subject themselves to a risk of harm." *Robinson*, 846 F.3d at 698 (emphasis added). The Supreme Court did so by recounting that in a single year, "there were 5,762 officer assaults and 11 officers killed during traffic pursuits *and stops*," which "prompt[ed] the Court to conclude that the public interest in police officer safety *during traffic stops* is both legitimate and weighty." *Id.* at 699 (cleaned up) (emphasis added). It would make little sense for the *Robinson* court to underscore officer safety during traffic stops if its holding didn't then reach those stops.

We don't dispute that *Robinson* explained that these general safety risks "without more" wouldn't justify a frisk. *Id.* Nor do we dispute that *Black* explained that exercising one's Second Amendment right, "without more" wouldn't justify an investigatory detention. *Black*, 707 F.3d at 540. But where we diverge from the dissent is that there *was* more to justify McDonald's seizure. And in *Black*, the police officers attempted to justify their seizure of Black through his *companion's* "lawful display of his lawfully possessed firearm." *Id.* But here, Greathouse's safety wasn't implicated solely because of Cates's

21

gun, but because of McDonald's physical resemblance to the second armed individual, his evasive behavior inside the vehicle, and his rev of the vehicle's engine. Under these circumstances, *Black* and *Robinson* can co-exist.

Put simply, we can't agree with our colleague that law enforcement was lying in wait to "provok[e]" a "frightened reaction," *id.* at 41, out of McDonald to justify seizing him. Greathouse didn't manufacture a reason to be in a high-crime area so that he could detain and search McDonald. Rather, Greathouse and the other officers were in the area because Cates was wanted for aggravated assault (among other charges) and had been livestreaming himself with a firearm. Cates then brandished the firearm after being seen interacting with McDonald but before McDonald was seized. And when Greathouse arrived, he immediately smelled marijuana. Meanwhile, McDonald, who resembled the second armed individual in the livestream with Cates, revved the engine after Cates fled and reached down beneath his seat.

The totality of these circumstances more than justified the search and seizure here.

\* \* \*

We agree with our colleague that our decisions should never provide fodder for law enforcement (or anyone) to abuse our Constitution. But we don't believe, given the fact-intensive analysis required for each Fourth Amendment case and our existing precedent, that today's holding could reasonably do so. We therefore affirm the district court's judgment.

*AFFIRMED*

22

WYNN, Circuit Judge, dissenting:

The Fourth Amendment demands that warrantless stops be justified by a particularized, objective basis for suspecting that the individual stopped is engaged in criminal activity. And while we evaluate the totality of the circumstances in determining whether that particularized basis existed, the totality-of-the-circumstances standard is not a magic wand that can transform unparticularized, innocuous facts into indicators of criminal activity.

But that is precisely how it operates in the majority opinion. The majority acknowledges that most of the factors on which it relies in concluding Greathouse had reasonable suspicion that McDonald was engaged in criminal activity would be insufficient on their own to justify a stop. Yet it holds, without explanation, that together they are sufficient to pass constitutional muster. Because I see the factors on which the majority relies as falling far below the threshold of reasonable suspicion—even when viewed together—I respectfully dissent.

I.

A police officer's suspicion that a person is engaged in criminal activity must be "grounded in specific and articulable facts." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987). Thus, the specific facts known to an officer engaging in a warrantless stop make all the difference for our analysis. Yet the majority handles the facts with little care, failing to consider exactly what Greathouse knew and when he knew it.

The majority purports to summarize the facts Greathouse "knew before he arrived at the housing complex" and those he "learned when he arrived on scene." Majority Op. at

23

10. But its description of that latter category demonstrates why its handling of the facts is troublesome—the relevant facts to our evaluation of reasonable suspicion are those known to Greathouse at the time he *seized* McDonald. *See, e.g.*, *United States v. Critchfield*, 81 F.4th 390, 394 (4th Cir. 2023). Thus, any facts Greathouse learned while he remained on scene *after* he had already seized McDonald—and any suspicion arising from such facts— are irrelevant to our analysis.

## A.

Like the majority, I start with the facts known to Greathouse before he arrived at the parking lot. Greathouse knew that Cates—not McDonald—was streaming live on Instagram and displaying a firearm. He also knew that Cates—not McDonald—had outstanding warrants for his arrest. And he knew that a second individual was also displaying a firearm in the Instagram video, but he did not know that individual's identity nor anything about him other than that he was wearing his hair in dreadlocks. That is, he had no reason to believe the second individual was not allowed to openly carry a weapon. Finally, Greathouse knew that the Cornwallis Housing Authority—the public housing complex from which Cates was livestreaming—was a "higher crime area[] in the city of Durham." J.A. 60.

So, we know that, prior to his arrival at the housing complex, Greathouse possessed no knowledge that McDonald even existed, much less any particularized basis to believe he was engaged in criminal activity. I turn next to the facts Greathouse learned after he arrived at the housing complex but before he seized McDonald.

24

B.

Determining what Greathouse knew when he seized McDonald requires that we pinpoint the precise moment at which the seizure occurred. Absent the use of physical force, a police officer seizes an individual when they engage in a "show of authority" to which the individual submits. *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). An officer has engaged in a show of authority "if the totality of the circumstances demonstrates that a reasonable person, measured objectively from an innocent citizen's perspective, 'would have believed that he was not free to leave.'" *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

I agree with the district court that the three officers were engaged in a show of authority from the moment they arrived at the housing complex. *See United States v. McDonald*, No. 1:21CR115-1, 2022 WL 475227, at *4 (M.D.N.C. Feb. 16, 2022). The officers pulled into the parking lot and stopped facing McDonald's car, blocking his vehicle such that "he was unable to drive the [car] safely away without striking either the police vehicle or Officer Greathouse." *Id.* Greathouse's body-worn camera shows the moment after he emerges from the police car, gun drawn and pointed at McDonald in the driver's seat of his vehicle (the individual to the left of the frame is another armed officer giving chase to Cates):

25



J.A. Vol. III (Video Exhibit) at 0:21. A reasonable person surely would not feel that they were free to leave a situation in which an officer drove up and immediately leapt from their car with a gun pointed at them, especially if the person's only option for departure was collision with either an officer's vehicle or the officer himself.

But while the district court concluded that a show of authority occurred at the moment the officers arrived, it went on to conclude that McDonald was not yet seized because he "did not initially submit to this authority but instead revved his engine, which indicated an attempt to leave the scene." *McDonald*, 2022 WL 475227, at *4. Thus, the district court concluded that McDonald was not seized until moments later. As pictured in the following screenshot, following the car rev, Greathouse crossed the parking lot, gun still pointed at McDonald, and gave the order that he turn off his car:

26



J.A. Vol. III (Video Exhibit) at 0:35. McDonald complied with Greathouse's order, turned

off the car, and thus, the district court concluded, had submitted to Greathouse's authority

and was seized. *McDonald*, 2022 WL 475227, at *4.

Based on Greathouse's body-worn camera footage, approximately fifteen seconds

elapsed between the three officers' arrival at the parking lot and McDonald turning off his

car. So, assuming the district court was correct about the moment of seizure,[1] we must

determine what facts Greathouse learned during those fifteen seconds.

---

[1] The majority accepts without question the district court's determination of when McDonald was seized. *See* Majority Op. at 6–7, 10. But, at a minimum, this is a much closer question than the majority acknowledges. True, we review a district court's determination of acquiescence to a show of authority only for clear error. *Cloud*, 994 F.3d at 244. But viewing the engine rev as indicative of attempted flight is dubious at best. Greathouse's body-worn camera footage shows that the direction the wheels on McDonald's vehicle were pointed did not change when the engine revved, even though McDonald would have needed to maneuver his car to the side to get around the police vehicle had he really been trying to flee. Nor, as the Government concedes, did the car itself ever move. *See* Response Br. at 4. So, to conclude that McDonald attempted to flee by revving the engine, we must assume that McDonald was so determined to flee that he

As the officers pulled into the housing complex, Greathouse observed that Cates was still on-scene but had no visible firearm. He then observed Cates standing several feet from and "interacting" with McDonald's car. J.A. 61. After Cates revealed his pistol and fled on foot, and the officers jumped out of their vehicle in pursuit, Greathouse heard McDonald's car engine rev and detected the general scent of marijuana. He then saw McDonald and his passenger "bending down and reaching," J.A. 65, and noticed that McDonald had his hair in dreadlocks. At that point, Greathouse gave McDonald the command to turn off his car, McDonald complied, and McDonald was therefore seized.

These are the only facts relevant to whether the initial seizure was supported by reasonable suspicion. It is of no relevance that "soon after" that moment, Greathouse saw McDonald lower his hands or that he was later able to particularize the smell of marijuana

---

was willing to barrel recklessly toward Greathouse and the police vehicle—even though Greathouse had a gun pointed at him—but also so incompetent that he forgot a car must be put in drive to move and that the wheel must be turned to guide the car toward a viable escape route. Moreover, as the above screenshot shows, Greathouse moved across the parking lot as he gave McDonald the order to turn off his car. If McDonald was determined to flee, why didn't he use that moment as an opportunity to maneuver around the police vehicle? Instead of seizing his best opportunity to flee, McDonald complied with Greathouse's command that he turn the car off. Either McDonald had a sudden change of heart and decided to acquiesce, or he was never going to flee and was acquiescent from the start, and only hit the gas pedal accidentally (perhaps startled by the sudden appearance of three men with guns, one of which was pointed directly at him). I think the latter is the far more obvious conclusion.

If McDonald acquiesced immediately, then he was seized as soon as his car was blocked in and officers jumped out of their vehicle with guns drawn. And, at that point, there could not possibly have been reasonable suspicion to stop McDonald because all Greathouse knew about him was that he had interacted with Cates, which the majority concedes is insufficient on its own to give rise to reasonable suspicion.

28

to McDonald's car. Majority Op. at 10. Nor does any failure by McDonald to follow orders after he shut off his car have any bearing on our analysis of whether Greathouse was justified in his initial seizure of McDonald. The majority acknowledges that when "Greathouse . . . pointed his weapon at the Honda and ordered its occupants to show their hands and McDonald to shut off the vehicle," "McDonald complied, at least at first." *Id.* at 4.

But, confusingly, the majority also notes in its recitation of the facts that McDonald was "disobeying Greathouse's commands." *Id.* at 10. True, Greathouse's body-worn camera footage shows that although McDonald initially raised his hands when he turned off his car, he later put them down and had to be ordered to put his hands back up. But that failure to follow Greathouse's orders came after the car was off—and therefore after the seizure—so it cannot properly factor into whether the initial seizure was supported by reasonable suspicion.[2]

If the majority means to imply that McDonald was seized and then negated that seizure merely by briefly lowering his hands, it cites no authority supporting that conclusion. We have stated that "a person's mere movement within a scene of police activity generally neither establishes *nor eliminates* acquiescence." *Cloud*, 994 F.3d at 244

---

[2] The majority attempts to justify its inclusion of irrelevant facts by noting that such facts are relevant to whether Greathouse had reasonable suspicion to *continue* detaining McDonald. Majority Op. at 10 n.4. But we need only reach that question if the initial seizure was justified, and it was not. By failing to make the distinction between facts learned before and after the initial seizure, the majority muddies the waters in an attempt to disguise that the facts known to Greathouse at the time he initially seized McDonald seizure were incredibly slim.

(emphasis added). True, intervening illegal acts by an unlawfully seized defendant can purge the taint of an unlawful seizure and prevent suppression of evidence obtained after the unlawful act. *See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997). But the defendant in *Sprinkle*'s actions were far more extreme than a brief lowering of hands—he fled from the unlawful stop and fired his gun at a police officer. *Id.* Here, Greathouse's body-worn camera shows that by the time McDonald lowered his hands, a minute had passed since he was seized and Greathouse had returned to his position by the police vehicle. And when Greathouse gave McDonald the order that he *keep* his hands where he could see them, McDonald complied and resumed his hands-up position. Thus, this momentary relaxation by McDonald is best characterized as "mere movement" that does not eliminate McDonald's overall acquiescence to Greathouse's authority.

So, at the moment he seized McDonald, Greathouse knew only that: (1) McDonald had "interacted" with a person who had outstanding warrants for his arrest and who had recently been armed in the vicinity of the parking lot; (2) another person had recently been armed in the vicinity of the parking lot; (3) the parking lot smelled like marijuana; (4) McDonald revved his engine and reached around within his car; and (5) all of this took place in a high-crime area. The majority's recitation of and reliance on facts that arose after Greathouse seized McDonald, like McDonald putting his hands down or Greathouse's later particularization of the marijuana smell to McDonald's car, misconstrues the scope of our reasonable-suspicion inquiry because those facts are entirely irrelevant to what Greathouse knew *at the time he initially seized* McDonald.

30

II.

In addition to erring by including irrelevant facts in its analysis, the majority errs by concluding that the relevant factors support reasonable suspicion. The majority is correct that we evaluate reasonable suspicion given the totality of the circumstances. But, in this case, each individual factor provides no basis to suspect that McDonald was engaged in criminal activity, and the total weight of those factors is no greater than the sum of its parts. To establish why, I address each factor individually before explaining why the totality of circumstances did not create reasonable suspicion.

First, as to McDonald's interaction with Cates, the majority acknowledges that the Supreme Court has held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."[3] *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). But the majority brushes off the

---

[3] I acknowledge that the Supreme Court's use of the phrase "without more" might indicate that association with people independently suspected of criminal activity is one factor that can be considered in a totality-of-the-circumstances analysis. But it is necessary to understand that statement in context. The Supreme Court made that statement in the context of assessing whether there was probable cause to believe the defendant was engaged in an illegal drug transaction based on his presence in a bar with a known drug dealer. *Ybarra*, 444 U.S. at 90–91. And the Supreme Court also noted that there was no evidence that "the bar was frequented by persons illegally purchasing drugs" nor was there evidence that the informant who had provided information on the known dealer had ever seen a drug transaction at the bar. *Id.* at 90. Thus, in context, the phrase "without more" indicates that, to properly consider propinquity to a person independently suspected of criminal activity as a factor in determining probable cause, there must be "more" factors indicating that the person is engaged *in the crime of which the known individual is suspected*. Here, none of the factors known to Greathouse indicated that McDonald was engaged in the aggravated assaults for which Cates had outstanding warrants, nor do the factors known to Greathouse indicate that McDonald had assisted Cates in illegally possessing a firearm.

31

Supreme Court's caution against importing one individual's criminality to another, pointing out that, unlike the Supreme Court in *Ybarra*, "we're assessing reasonable suspicion and not probable cause." Majority Op. at 11.

To be sure, the majority is correct that the Supreme Court has never explicitly extended its holding in *Ybarra* to the reasonable-suspicion context. But *this* Court has been clear that "[t]here is no reasonable suspicion merely by association." *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013). Although he had outstanding arrest warrants, at the time he was interacting with McDonald, Cates had no visible weapon and was not obviously engaged in criminal activity. As far as the officers could see, Cates and McDonald were merely two people hanging out in a parking lot on a Friday afternoon.[4] Accordingly, this factor on its own cannot give rise to suspicion of criminal activity.

Second, the fact that an unknown individual had recently been armed while in the parking lot's vicinity, and Greathouse's assumption that McDonald was that individual, similarly provides no basis from which to conclude McDonald was engaged in criminal activity. For one, Greathouse assumed—wrongly, it turned out—that McDonald was the unknown individual from the Instagram video based solely on his hairstyle. Greathouse

---

[4] In the majority's view, that Cates was wanted on outstanding warrants somehow undermines this description. Majority Op. at 14. But, as I note above, Cates had stowed the firearm and was not visibly engaging in crime when the police arrived. So, all the police observed when they arrived was a casual conversation between the two men. And while the facts independently known to the police about one of the men—Cates—allowed them to seize *him*, such facts do nothing to transform the otherwise innocuous nature of the scene such that *McDonald* was implicated in crime.

32

had never even seen the Instagram video, so any man wearing his hair in dreadlocks was just as likely to be the armed person from the video as McDonald.

In fact, McDonald wasn't the only individual with dreadlocks in the parking lot that day—a man standing right next to McDonald's vehicle also had that hairstyle—making Greathouse's assumption that McDonald must be the person from the video even more presumptuous. Indeed, not only was that other individual more visible to Greathouse than McDonald, since he was outside the car, but Greathouse also gave commands to and interacted with the individual. Yet, based on his later statement to another officer that McDonald was the only person present with dreadlocks, J.A. 113, Greathouse appears to have totally ignored that there was another man in the parking lot with dreadlocks.

The majority argues that we are in no position to question Greathouse's assumption that McDonald was the person from the video. Majority Op. at 17. While it is true that we *defer* to the district court's credibility determinations on clear-error review, our review is not toothless. *Cf. United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012). But even if we credit Greathouse's bold assumption that McDonald was the armed individual from the Instagram video—an assumption the Government concedes was incorrect—that assumption still does not justify a warrantless seizure. Although he later learned that McDonald had previously been convicted of a felony and thus could not lawfully possess a firearm, at the time he seized McDonald, Greathouse knew nothing about McDonald's felony status. Because "[b]eing a felon in possession of a firearm is not the default status," Greathouse had no reason to think that McDonald was engaged in criminal behavior even

33

given his faulty assumption that McDonald was the person in the video. *Black*, 707 F.3d at 540.

To be sure, we were clear in *Black* that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention." *Id.* And North Carolina's state constitution protects the right, with some exceptions not relevant here, to openly carry a firearm. *State v. Kerner*, 107 S.E. 222, 223 (N.C. 1921). Thus, Greathouse's suspicion that McDonald was—presumptively—lawfully in possession of a firearm does not provide a particularized basis to believe that he was engaged in criminal activity.[5]

The majority cites *United States v. Robinson*, 846 F.3d 694 (4th Cir. 2017), noting that "*Black* doesn't apply when a person is otherwise lawfully stopped and his potentially legal possession of a firearm poses a threat of danger to law enforcement." Majority Op. at 19. While that fairly characterizes our holding in *Robinson*, citing it here ignores the core difference between *Robinson* and the case at hand: in *Robinson*, the defendant

---

[5] In the majority's view, however, we cannot even consider *Black*'s application to the present case merely because McDonald does not cite it. Majority Op. at 18. But the government relies on Greathouse's belief that McDonald was the armed individual from the video as justification for the seizure, Response Br. at 16, as did the district court, *McDonald*, 2022 WL 475227, at *4. Because accepting the government's argument is directly at odds with our binding precedent, I would exercise our discretion to excuse any waiver by McDonald of the argument that Greathouse's suspicion that McDonald was in possession of a presumptively lawful firearm was insufficient to justify the stop. *Cf. Manning v. Caldwell*, 930 F.3d 264, 271–72 (4th Cir. 2019) (en banc) (collecting cases); *Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them.").

34

acknowledged that the initial stop by police was *lawful*. *Robinson*, 846 F.3d at 697–98. Thus, we said, where an individual is *already* lawfully stopped, concerns of officer safety justify a frisk based on a suspicion that the lawfully stopped individual is armed—lawfully or not. *Id.* at 698–701. By arguing that *Robinson* applies here, where McDonald argues the initial stop was *un*lawful, the majority makes precisely the mistake we highlighted in the defendant's argument in *Robinson*—it "collapses the requirements for making a stop with the requirements for conducting a frisk." *Id.* at 698.

The majority characterizes this statement in *Robinson* as "simply acknowledging that a frisk requires more than a stop." Majority Op. at 20. Not so. That statement was part of our explanation that the standard for a frisk *differs* from the standard for a stop—the latter requires some suspicion of *unlawful* activity, and the former requires suspicion that the lawfully stopped person is *dangerous*. *Robinson*, 846 F.3d at 698. And—as we made clear in *Robinson*—if officers suspect that a lawfully stopped person is armed, that is sufficient to give rise to an inference that the person is dangerous. *Id.* at 700–01. But suspicion that a person might pose a danger to officers *if* they are stopped does not justify stopping them in the first instance.

It is for this reason that the majority's posturing about officer safety during traffic stops rings hollow. The majority emphasizes our statement from *Robinson* that "the Supreme Court repeatedly recognized that whenever police officers use their *authority to effect a stop*, they subject themselves to a risk of harm." Majority Op. at 21 (quoting *Robinson*, 846 F.3d at 688)). But that statement has no relevance here, where what McDonald challenges is whether officers *had authority* to effectuate the stop at all. Thus,

35

the majority's position that "[i]t would make little sense for the *Robinson* court to underscore officer safety during traffic stops if its holding didn't then reach those stops," Majority Op. at 21, is merely an attempt to further muddy the waters about what was at issue in *Robinson* and what is at issue in the present case. It makes perfect sense for *Robinson*'s statements about officer safety *during stops* to have no application to the standard for *initiating* a stop.

Again, the stop must be justified by suspicion of *unlawful activity*—a standard which the defendant in *Robinson* conceded was easily met, because police officers observed that he was not wearing a seatbelt in a moving vehicle. *Id.* at 697. But because, in states like North Carolina where open carry of firearms is permitted, a person openly carrying a firearm is engaging in presumptively *lawful* activity, *Black*, 707 F.3d at 540, such activity cannot on its own justify a stop. Put simply, *Robinson* has no bearing on our analysis until we have first concluded that the stop was lawful. Read any other way, *Robinson* and *Black* would be irreconcilable.

Third, a general odor of marijuana in a public place cannot provide a *particularized* basis to believe one of the place's occupants is engaged in criminal activity. The district court found—and the Government does not challenge—that, at the time he seized McDonald, Greathouse "could not yet particularize this smell to [McDonald's car]." *McDonald*, 2022 WL 475227, at *4. Thus, any of the multiple individuals or vehicles in the parking lot could have been the source of the odor. If being present in an area where there is a marijuana odor is sufficient to stop McDonald, then it must follow that anyone present in an area that smells generally of marijuana is subject to being seized at the whim

36

of a police officer. I do not think the Fourth Amendment tolerates such a sweeping exception to its protections.

Fourth, the majority notes that all of this took place in a high-crime area. But it is notable that this "high-crime" area was a public housing complex. Residents of public housing are no "less worthy of Fourth Amendment protection" merely by "virtue of where they live." *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020). And it also bears noting that this encounter occurred at around 3 PM on a Friday. It is hardly indicative of criminal activity that a group of young people were hanging out in the parking lot of an apartment complex—where at least some of them presumably lived—on a Friday afternoon. *See Black*, 707 F.3d at 542 (concluding district court erred in denying motion to suppress where "[t]he pertinent facts remaining in the reasonable suspicion analysis are that the men were in a high crime area at night").

Finally, we have the only factor that is even somewhat particularized to McDonald—that he revved his engine and "reached" around in his car when he saw the police officers jump out of their vehicle. True, "[e]vasive behavior is a pertinent factor in determining reasonable suspicion," but an officer "must do more than simply label a behavior as 'suspicious' to make it so." *United States v. Foster*, 634 F.3d 243, 247–48 (4th Cir. 2011) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

The district court, and now the majority, accepted without question Greathouse's characterization of McDonald's actions as being indicative of an attempt to flee or destroy evidence, but I am not convinced. This Court has emphasized that "it is important not to overplay a suspect's nervous behavior in situations where citizens would normally be

37

expected to be upset." *United States v. Slocumb*, 804 F.3d 677, 683 (4th Cir. 2015) (quoting *United States v. Glover*, 662 F.3d 694, 699 (4th Cir. 2011)). McDonald was sitting in his car in a parking lot chatting with friends when three officers drove up in an unmarked vehicle with no siren blaring to give a warning; opened their doors while the vehicle was still moving; and then jumped out, guns drawn and aimed at McDonald and his friends. That McDonald reacted to this unquestionably upsetting scene by floundering in his car and hitting the gas pedal does not, in my view, give rise to reasonable suspicion that he was engaged in criminal activity. Instead, those behaviors are consistent with surprise at and fear of the sudden turn of events.

The majority turns our precedent on its head by announcing that "[s]imply labeling a circumstance as innocuous doesn't make it so." Majority Op. at 16. And, in its view, where both the government and the district court have labeled a behavior as suspicious, our standard of review forces us to accept that characterization. *Id.* at 13–14, 16. Not so. We have consistently performed our own analysis of an individual's behavior to determine whether we agree with the government's characterization of it as suspicious. *See, e.g.*, *Slocumb*, 804 F.3d at 683; *Foster*, 634 F.3d at 247; *Sprinkle*, 106 F.3d at 918. And, especially because McDonald's reaction to the police was one of the primary factors on which the district court relied in concluding that the seizure was supported by reasonable suspicion and which the government stresses before us, there is no reason to abandon that analysis here.

Nor am I persuaded by the majority's suggestion that Greathouse's "reasonable fear for his safety" arising from the engine rev justifies McDonald's seizure. Majority Op. at

38

12. To the extent Greathouse's fear that he was going to be run over justified his order to McDonald that he turn the car off, any reasonable fear dissipated once McDonald complied with that order. At that point, Greathouse was no longer in danger and could have let McDonald and his friends disperse.

In fact, that's precisely what Greathouse did do as to the individuals standing outside of McDonald's car—he can be heard on his body-worn camera footage telling them to "just go" and to "leave." J.A. Vol. III (Video Exhibit) at 2:10. Although he had gathered no additional facts about McDonald at that point, instead of allowing McDonald to disperse with the other individuals, Greathouse approached McDonald's vehicle and particularized the odor of marijuana to McDonald's car. *See McDonald*, 2022 WL 475227, at *5 (noting that the "increase in strength of the smell when he approached Defendant's car" allowed Greathouse to particularize the smell to McDonald's vehicle). This extended intrusion into McDonald's liberty cannot be justified by initial safety concerns that had since been ameliorated.

To its credit, the majority does acknowledge that most of these factors would, on their own, be insufficient to justify a seizure. Majority Op. at 11. But it emphasizes that "context matters"—apparently concluding that the "context" in which the seizure occurred transformed otherwise insufficient factors into a constitutionally sufficient basis for a warrantless seizure. *Id.* at 12.

I agree that context matters. But viewing McDonald's actions in context leads me to reach the opposite conclusion. McDonald is a Black man who was twenty-three years old on the date of the seizure. He was peacefully interacting with other young people in a

39

public space when multiple police officers suddenly appeared and pointed firearms at him. All three officers were armed with 9-millimeter handguns, and one had an M4 rifle. Upon encountering the parking lot and seeing Cates, the officers jumped out of their car and trained their weapons—including the rifle—on the group of individuals in the parking lot. Within a matter of seconds, Cates—the only person known to law enforcement before the encounter began, and the only person for whom reasonable suspicion of criminal activity existed—had fled and Greathouse had seized everyone else at gunpoint.

The majority apparently views Greathouse's observations in these brief moments of commotion as sufficient to give rise to a particularized suspicion that McDonald was engaged in criminal activity. But viewing McDonald's actions in context shows that he was a young, Black man reacting in a very human way to an alarming set of circumstances. Neither the general odor of marijuana, nor this encounter occurring in a high-crime area, nor the majority's invocation of the totality-of-the-circumstances standard transforms this natural, understandable reaction into the harbinger of criminal activity that the majority makes it out to be.

Following the majority's logic, officers hoping to drum up searches need only patrol "high-crime" areas, guns drawn, waiting for someone to react in a frightened way before they can permissibly engage in a search. And, as this Court has previously observed, "the demographics of those who reside in high crime neighborhoods often consist of racial minorities and individuals disadvantaged by their social and economic circumstances." *Black*, 707 F.3d at 542.

40

It is highly relevant to consider that a recent study of police killings from 2015 through 2020 found that Black people are more than twice as likely as white people to be killed by police, and individuals living in the lowest-income quintile of census tracts are more than three times as likely to be killed by police than those in the highest-income quintile.[6] Considering the overlap between the demographics of those individuals most likely to live in high-crime areas and individuals with the most reason to be fearful of police, today's majority opinion may encourage officers to unconstitutionally create a reasonable suspicion basis by provoking the type of frightened reaction the majority uses to justify this search.

Perhaps some of these searches may yield evidence of a crime, as in the case of McDonald. However, many searches won't result in criminal charges, which means the vast majority of individuals subjected to unconstitutional searches remain undocumented in court cases.[7] And, importantly, the "fact-intensive analysis required for each Fourth Amendment case and our existing precedent," Majority Op. at 22, do very little to protect individuals whose cases never come before us.

---

[6] Justin Feldman, People's Pol'y Project, *Police Killings in the U.S.* 6 (2020), https://www.peoplespolicyproject.org/wp-content/uploads/2020/06/PoliceKillings.pdf [https://perma.cc/ZEQ2-23D2].

[7] A miniscule portion of these innocent individuals may eventually find their way before us through § 1983 actions. But that requires that they have the knowledge, time, and resources to pursue such an action. And in the face of the significant hurdle posed by qualified immunity—especially in the face of decisions like the majority's today—most individuals subject to these encounters will be without recourse.

At the end of the day, the exclusionary rule, a prudential doctrine created to "compel respect for the constitutional guaranty," *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)), loses its purpose when evidence from an unconstitutional search is not suppressed. The majority's failure to do so denies innocent people facing similar searches their Fourth Amendment rights, making it easier for officers to conduct stops and searches without a constitutional basis. This increased ease comes at the expense of whittling away the Fourth Amendment rights of innocent individuals, placing their lives at risk.

This is far too high a price for the most vulnerable among us to pay. I must, respectfully, dissent.